The SEYMOUR NATIONAL BANK, as Guardian for Timothy Clyde O'Sullivan, the Seymour National Bank, as Special Administrator of the Estate of Deborah O'Sullivan, John L. O'Sullivan, Plaintiffs-Appellants,

v.

STATE of Indiana, Defendant-Appellee.

No. 781S185.

Supreme Court of Indiana.

July 10, 1981.

Kenneth A. Layton, Montgomery, Elsner & Pardieck, Seymour, for plaintiffs-appellants.

Lloyd H. Milliken, Jr., Locke, Reynolds, Boyd & Weisell, Linley E. Pearson, Atty. Gen., G. Richard Potter, Deputy Atty. Gen., Indianapolis, Thomas C. Bigley, Jr., Sharpnack, Bigley, David & Rumple, Columbus, for defendant-appellee.

PRENTICE, Justice.

This cause is before us upon the petition of Defendant (Appellee), State of Indiana, to transfer the cause from the Court of Appeals, First District, that Court having reversed the trial court's granting of summary judgment in the defendant's favor, by opinion reported at 384 N.E.2d 1177.

Transfer is hereby granted pursuant to Ind.R.App.P. 11(B)(2)(b) in that the Court of Appeals has erroneously decided a new question of law, i. e. the interpretation to be placed upon the term "enforcement of a law," as used in the Indiana Tort Claims Act, Ind.Code § 34–4–16.5–3(7).[1]

1. We note that, at the time of the events at bar, Ind. Code § 34–4–16.5–3(7) provided in pertinent part: "IMMUNITY FROM LIABILITY. —A governmental entity or an employee is not

The relevant facts were set forth by the trial court in its determination of Defendant's motion for summary judgment as follows:

"This cause having been submitted to the Court on the motion for summary judgment filed by the defendant, the State of Indiana, and upon pleadings, interrogatories and answers thereto, and affidavits in support of said motion for summary judgment, and the Court, having heard oral arguments thereon and having considered briefs filed by the parties herein, now finds:

"1. On November 28, 1974, Sargent L. Richey (hereinafter Trooper Richey) was employed by the State of Indiana as a State Trooper for the Indiana State Police. Sometime after 11:00 A.M. on said date in the course and scope of his employment, Trooper Richey was on patrol in Jackson County, Indiana near the Uniontown exit of Interstate Highway 65.

"2. At about the same time, C. W. Leffler (hereinafter Trooper Leffler) was also on patrol as a State Trooper on Interstate 65, heading in a northerly direction at a location north of Trooper Richey. In the course of his duties Trooper Leffler observed a Chevrolet Nova automobile proceeding southbound on Interstate 65, at what appeared to be an excessive rate of speed and equipped with a rear bumper in violation of the statute regulating bumper heights (IC 1971, 9–8–6–37.5). Because of traffic conditions Trooper Leffler deemed it inadvisable to move from the northbound lanes to the southbound lanes of Interstate 65 in order to pursue the Nova. Knowing that Trooper Richey was on patrol to the south, Trooper Leffler radioed Trooper Richey and advised him of the situation. Trooper Richey then took up a position at the Uniontown exit on Interstate 65 so that he could observe the Nova as it passed.

"3. A short time later, the Nova came into Trooper Richey's view and although at this time it was not being operated at an excessive rate of speed, the bumper height appeared to be excessive. As soon as traffic permitted, Trooper Richey drove on to Interstate 65 and proceeded to follow the Nova and thereafter decided to stop it for investigation of the rear bumper height.

"4. When Trooper Richey was finally able to position his vehicle beind [sic] the Nova, the driver, later identified as John J. Bunce, suddenly pulled around the vehicle in front of him. Immediately he cut back in front of the passed vehicle and maintained a position just a short distance ahead of the passed vehicle. Trooper Richey attempted to follow the Nova, but because of the position of the Nova in relation to the vehicle behind it, he was unable to get his police vehicle in behind the Nova to stop it with the minimum disruption of the traffic flow. After the lapse of some time Trooper Richey was able to get the attention of the driver of the car immediately behind the Nova. This driver reduced his speed permitting Trooper Richey to position his vehicle behind the Nova. He then signalled John Bunce to pull off the driving lane.

"5. Trooper Richey stopped his vehicle a short distance behing [sic] the Nova and as he did so he observed what appeared to be bullet holes in the trunk lid. He also noticed that Mr. Bunce seemed to be fumbling with something down on the left side of the front seat. He proceeded cautiously to the left front door of the Nova positioning himself so that he could observe both southbound traffic and the movements of Mr. Bunce. When Mr. Bunce was unable to produce either a driver's license or vehicle registration,

liable if a loss results from: . . . (7) the enforcement of or failure to enforce a law." The statute was amended in 1976 and now provides in pertinent part: "IMMUNITY FROM LIABILITY. A governmental entity or an employee acting within the scope of his employment is not liable if a loss results from: . . . (7) the adoption and enforcement of or failure to adopt or enforce a law, including rules and regulations, unless the act of enforcement constitutes false arrest or false imprisonment." Ind. Code § 34–4–16.5–3(7) (Burns Supp. 1980).

Trooper Richey requested him to come back to the police car where an identification check could be made. Bunce started to open the door in apparent compliance with Trooper Richey's request, but instead of getting out of the car, Bunce quickly accelerated and drove off at a high rate of speed bumping and knocking Richey backward.

"6. Trooper Richey rushed to his car which at the time was located approximately 1¼ to 1½ miles north of the Crothersville exit. As soon as traffic permitted and after activating a flashing red light located atop the police car and the siren, Trooper Richey commenced pursuit. He observed Bunce cut in front of traffic, nearly causing an accident, and then leave Interstate 65 at the Crothersville southbound exit which lead to U.S. 31. As he drove down the ramp, Bunce forced another car off the road. Bunce then disregarded the stop sign at the end of the exit ramp, slid on to U.S. 31, and drove south toward Austin, Indiana.

"7. Trooper Richey advised the Seymour State Police Post that he was still in pursuit. In addition to the siren and flashing red light, he turned on the four-way flashers and head lights. As the two vehicles proceeded south on U.S. 31, they were both traveling at speeds in excess of 100 miles per hour. The distance between the two cars remained about ¼ of a mile. Trooper Richey observed several vehicles proceeding southbound on U.S. 31 near the northern limits of Austin, and he saw at least two cars leave the road as Bunce passed them.

"8. U.S. 31, as it approaches Austin, is upgrade for southbound traffic and then runs downgrade toward the junction of U.S. 31 and State Road 56. Trooper Richey felt it important that he reach the crest of the road before Bunce reached this intersection so that he could observe which road Bunce took. However, Trooper Richey was aware of the potential danger to traffic. He, therefore, reduced his speed to below 100 miles per hour as he approached the traffic ahead, believing that at the reduced speed he could still make the necessary observation.

"9. There were, in fact, three vehicles proceeding south on U.S. 31 at the time Bunce approached Austin. First in line was a Mustang operated by Timothy Clyde O'Sullivan. Second in line was a vehicle operated by David Mains, and third in line was a vehicle operated by Larry Walker. David Mains observed the Nova pass the Walker vehicle. Realizing its excessive speed, he pulled his vehicle off to the right. After Bunce passed the Mains' vehicle, he moved the Nova farther to the left and passed the O'Sullivan vehicle which had not pulled off the road. As soon as the Nova passed him, Mr. Mains pulled his car back on the road. Almost immediately he heard a siren and shortly thereafter observed a police car approaching him from the rear with a flashing red light operating. Both Mr. Mains and Mr. Walker yielded to the police car by pulling off the road. The O'Sullivan vehicle continued to proceed south in the driving lane. Trooper Richey moved into the northbound lane to pass the O'Sullivan car. However, shortly before reaching the intersection of U.S. 31 and Wilbur Avenue, Timothy O'Sullivan turned to the left in front of Trooper Richey and the collision occurred.

"10. Subsequent to the collision, John Bunce was apprehended in Scottsburg. An examination of the Nova confirmed that the rear of the vehicle was riddled with bullet holes which appeared to be 38 caliber.

"11. That on November 28, 1974, Section 3 of the Indiana Tort Claims Act, 34–4–16.5–3, provided in part as follows:

'Section 3. A governmental entity or an employee is not liable if a loss results from:

\*      \*      \*      \*      \*      \*

'(7) The enforcement of, or failure to enforce, a law.'

"12. That the loss for which claim is made herein resulted from the enforcement of a law by Sargent L. Richey, an Indiana State Trooper employed by the defendant, State of Indiana.

"13. That the State of Indiana is immune from civil liability for the losses suffered by the plaintiffs herein.

"14. That there is no genuine issue as to any material fact, and the defendant is entitled to a judgment as a matter of law.

"IT IS, THEREFORE, CONSIDERED, ORDERED AND ADJUDGED by the Court that the defendant's motion for summary judgment be, and the same hereby is, granted, and,

"It is further considered, ordered and adjudged by the Court that plaintiffs recover nothing by their complaint herein." 384 N.E.2d at 1179–81.

Given these facts, the issue before us is whether Trooper Richey was engaged in the "enforcement of a law." If so, the Indiana Tort Claims Act immunizes the defendant from liability.

■ Plaintiffs contend that the term "enforcement of a law" is ambiguous and that therefore we should resort to rules of statutory construction. We do not accept that contention, for in our view, an officer engaged in effecting an arrest is in fact enforcing a law. And, in cases where a statute is clear and unambiguous, we have no choice but to hold it to its plain meaning. *E. g., Lindley v. State* (1978) 268 Ind. 83, 373 N.E.2d 886; *Ott v. Johnson* (1974) 262 Ind. 548, 319 N.E.2d 622; *Cheney v. State ex rel. Risk* (1905) 165 Ind. 121, 74 N.E. 892. Moreover, even if we were to accept Plaintiffs' contention, we perceive the Legislature's amendment of Ind. Code § 34–4–16.-5–3(7)[2] as having a clarifying effect on the statute insofar as *all* acts of enforcement save false arrest and imprisonment now render the State immune. In cases of ambiguity, we may resort to subsequent amendments in order to glean the Legislature's initial intent. *See, e. g., Wilson v. State* (1978) Ind., 383 N.E.2d 304; *Hilligoss v. LaDow* (1977) Ind.App., 368 N.E.2d 1365, *appeal dismissed* (1978) 436 U.S. 942, 98 S.Ct. 2840, 56 L.Ed.2d 783.

■ We agree with the trial court that Trooper Richey was engaged in the enforcement of a law, at the time the accident occurred. The immunizing section of the Tort Claims Act is therefore applicable. Accordingly, the decision and opinion of the Court of Appeals are ordered vacated, and the judgment of the trial court is affirmed.

GIVAN, C. J., and PIVARNIK, J., concur.

DeBRULER, J., dissents with opinion in which HUNTER, J., concurs.

HUNTER, J., dissents with opinion in which DeBRULER, J., concurs.

ON PETITION TO TRANSFER

DeBRULER, Justice, dissenting.

Operators of motor vehicles upon the public streets and highways, whether in the employ of another or not, owe a private legal duty to others using the streets, to use due care while driving. This duty is imposed upon governors, judges, legislators, public employees and private employees and citizens, alike, when taking the wheel. That the General Assembly should grant to any person a legal immunity from liability when operating a motor vehicle upon a public street, is an astounding proposition, as it is totally at odds with the pervasive regulation of that activity by the State.

The state police officer, in this case, in taking up pursuit of a suspect in his patrol car, carried two legal duties, one private and one public. As pointed out by Judge Robertson, in his discerning opinion for the First District Court of Appeals, the driver of an emergency vehicle, while permitted to operate it beyond the limits set for ordinary driving, nevertheless has a statutorily imposed duty towards private individuals to drive it during emergency runs with due regard for the safety of all persons. Ind. Code § 9–4–1–25. The officer in pursuing the suspect and attempting to arrest him was also acting in furtherance of a duty owed solely to the public, i. e., the duty to

2. *See* note 1 *supra.*

enforce the criminal laws. See, *Simpson's Food Fair, Inc. v. City of Evansville*, (1971) 149 Ind.App. 387, 272 N.E.2d 871. To give full rein under these circumstances to the one is to vitiate the other. Yet to permit that result is our unavoidable judicial duty.

In construing the statutory terminology "enforcement of a law" Judge Robertson drew upon the fundamental rules that statutes in derogation of the common law will receive a strict construction and statutes will not be construed in a manner resulting in harsh or unjust consequences. To these I would add another which is that where two statutes are in apparent conflict they should be construed if it can be reasonably done, in a manner so as to bring them into harmony. *Wayne Twp. v. Brown*, (1933) 205 Ind. 437, 186 N.E. 841; *Thompson v. Thompson*, (1972) 259 Ind. 266, 286 N.E.2d 657. Here, the immunity statute is in derogation of the common law and at odds with the statutory command that emergency vehicles be operated with due care. At common law this state police officer would be required to respond in damages for injuries resulting from his negligent operation of the patrol car. To grant an immunity which would shield negligent and reckless conduct obviously leaves injured victims to suffer without any remedy. Were we to construe the vague immunity provision as being applicable only in circumstances in which the public employee's conduct involved a public duty only, impediment of the common law would be lessened, unjust consequences would be reduced in number, and the two statutes would be left viable and in harmony. This is the legal course charted by Judge Robertson, and I am convinced it is the correct one. I would therefore reverse and remand for trial as did the Court of Appeals.

HUNTER, J., concurs, with separate opinion.

## ON PETITION TO TRANSFER

HUNTER, Justice, dissenting.

I must respectfully dissent from the majority opinion; I am unable to accept the proposition that the legislature intended the literal reading and application of Ind. Code § 34–4–16.5–3(7) (Burns 1980 Supp.) which the majority attributes to it here. The implications of the conclusion that our governmental entities enjoy absolute immunity in the "enforcement" of any law are very unsettling. We have, it appears, returned full circle to the anachronistic notion that "the King can do no wrong," for the majority's literal application of the statute means citizens have no recourse in law for a loss sustained at the hands of a governmental employee "enforcing" a law, even where the conduct may be malicious, grossly negligent, or in willful and wanton disregard for public safety or property.

Without question governmental entities must be accorded a certain immunity for the acts of its employees in the enforcement of laws. The circumstances which attend the need for law enforcement oftentimes demand immediate and aggressive action to insure the public welfare; because the acts accompanying the enforcement sometimes occur in public thoroughfares and places, unfortunately yet inevitably damage to private property or injury to innocent bystanders occasionally results.

Police officers, of course, are the governmental employees who confront such a situation on a regular basis. For that reason, our legislature has authorized programs for the law enforcement officers of this state, which expressly includes instruction in safety and the pursuit and apprehension of suspected criminals. Ind. Code § 10–1–3–1 *et seq.* (Burns 1981 Repl.); Ind. Code § 17–3–9–1 (Burns 1974).

Likewise, to minimize the risk of injury to innocent bystanders or private property, the state police, pursuant to the legislative powers delegated that body by the General Assembly, has adopted departmental rules and regulations to govern the conduct of its officers. Administrative Rules and Regs. § (10–1–1–4)–11 (Burns 1976). Therein, the following acts are prohibited and warrant disciplinary action:

"7. *Wilful or grossly negligent* loss or destruction of state property or the prop-

erty of another, except where destruction is properly authorized.

"8. *Capricious or grossly negligent* endangerment of the life and limb of another person.

"9. Conversion of the property of another, public property or contraband, to private or unauthorized use without proper authority.

"10. *Wilful or negligent disregard* of the property rights of another through the exercise of police authority." *Id.* [emphasis added].

The prohibition against gross negligence and wanton or malicious misconduct, as well as the police training program, is designed to protect life and property from needless harm or destruction at the hands of irresponsible conduct. It is incongruous that the legislature, in the face of these rules and the reasons therefor, would enact a statute by which the victim of such reprehensible conduct would be barred from obtaining redress from the offending governmental entity in our courts of law. And the conclusion that an injured citizen must endure the economic consequences without recompense is offensive when measured against the disability, death, and survivor benefits which, by statute, would be available to an officer injured or killed in the same incident. Ind. Code § 10–1–2–1 *et seq.* (Burns 1981 Repl.); Ind. Code § 19–1–24–1 *et seq.* (Burns 1974).

Can it reasonably be said that our legislature intended to grant absolute immunity to the governmental entity whose employee-officer, in pursuit of a shoplifter, might drive his automobile through a crowded playground at high speeds, thereby injuring children? It is an extreme example in fact, yet the literal application of the immunity provision is an extreme rule in law which will engender extraordinarily harsh results.

It should also be noted that the "enforcement" of laws is not the exclusive bailiwick of police officers. By express statutory provisions, assorted governmental officials are vested with the power to enforce specific laws. *See, e. g.* Ind. Code § 14–3–4–1 *et seq.* (Burns 1981 Repl.) (law enforcement division of Department of Natural Resources created to "enforce" conservation laws); Ind. Code § 16–1–4–2 (Burns 1973) (local health officers granted power to "enforce" health laws, ordinances, orders, and rules and regulations); Ind. Code § 22–8–1.-1–35.6 (Burns 1974) (commissioner of Occupational Health and Safety Board has power to "enforce" a safety order, penalty assessment, or notice of failure to correct violation); Ind. Code § 22–2–9–4 (Burns 1974) (commissioner of Labor Division has duty to "enforce" wage claim laws); Ind. Code § 22–11–5–6 (Burns 1974) (state fire marshal has power to "enforce" all laws of state and cities regarding fires, explosives, combustibles, fire alarms and extinguishing equipment, and the investigation, prosecution, and suppression of arson).

From these few statutes it can readily be seen that the legislature has employed the term "enforcement" in a wide range of government-controlled activities which, depending upon the particular statutory context, gives rise to various connotations and interpretations of the word "enforcement." Furthermore, the legislature, in numerous other statutes, has refrained from use of the word "enforcement" but has granted powers which are designed to serve the purpose of law enforcement. *See, e. g.* Ind. Code § 22–8–1.1–23.1 (Burns 1974) (commissioner of Occupational Health and Safety Board or his representative has power to enter and inspect premises of employer for suspected violations); Ind. Code § 14–2–3–2 (Burns 1981 Repl.) (director of Division of Fish and Wildlife or his representative may enter into private property for the purpose of killing, removing, managing, or protecting a wild animal); Ind. Code § 14–2–9–1 (Burns 1981 Repl.) (director of Fish and Wildlife Division, game wardens and deputy game wardens have power to search boats, vehicles or any receptacle in which game could be found to secure evidence of a violation of fish and game laws).

I point out the existence of these latter enactments because in each the legislature has prescribed conduct which is in the nature of a search and seizure. Under the

literal interpretive sense employed by the majority, a search and seizure conducted prior to a determination that a law has in fact been violated cannot be described as the "enforcement" of a law. Rather, it is a preliminary act from which enforcement may or may not follow; all such searches and seizures by officers of the state consequently fall outside the immunity statute under the interpretation proffered by the majority.

In short, behind the Court's opinion here today waits a Pandora's box of unsettling questions which will revolve around dubious distinctions between the "administration" and "enforcement" of laws. The source of that inevitable consternation is the fact that the term "enforcement" in Ind. Code § 34–4–16.5–3(7), *supra*, is ambiguous both in and of itself and in relation to the various statutes with which it must be construed and reconciled.

For these reasons, I, like Justice DeBruler, am persuaded by the statutory analysis ably outlined by Judge Robertson for the unanimous Court of Appeals. *Seymour Nat. Bank v. State*, (1979) Ind.App., 384 N.E.2d 1177. I share the opinion that the legislature embraced and enacted the common law of this state as it existed at the time Ind. Code § 34–4–16.5–3, *supra*, was passed. *See Campbell v. State*, (1972) 259 Ind. 55, 284 N.E.2d 733; *Board of Commissioners of Delaware County v. Briggs*, (1975) 167 Ind.App. 96, 337 N.E.2d 852; *Simpson's Food Fair, Inc. v. City of Evansville*, (1971) 149 Ind.App. 387, 272 N.E.2d 871.

Here, the plaintiff should have been permitted to present his claim to the jury. Were that the case, I agree with Judge Robertson that it would be imperative to a proper factual resolution that the jury be exposed to standards of police practice relative to the circumstances at issue. To that end, it would be appropriate to instruct the jury regarding the various rules of conduct enunciated in Administrative Rules and Regs. § (10–1–1–4)–11, *supra*, as well as the operative factors detailed by Judge Robertson:

"[S]uch circumstances might include among others, the probability of harm to third persons and the gravity of an injury that would result therefrom, the availability of assistance by other police units, and the severity of the criminal conduct of the suspected felon [criminal]." *Seymour Nat. Bank v. State, supra* at 1187. I would clarify "the probability of harm to third persons" to indicate that "the harm" refers to injury which might flow from the hand of the criminal suspect as well as that of the law enforcement officer.

Unfortunately, however, there will be no opportunity for these guidelines to be implemented. Even more unfortunate are the ramifications of the rationale upon which the plaintiffs' action is barred. I dissent in both respects. The cause should be remanded for a trial on the merits.

DeBRULER, J., concurs in separate opinion.