454 N.E.2d 1253 (1983)
E. Robert JACOBS, Plaintiff-Appellant,
v.
CITY OF COLUMBUS, by and through Its Police Department, State of Indiana, by and through Its Department of State Police, John Myers, Ronald Chandler and Richard Barker, Defendants-Appellees.
No. 1-383A69.
Court of Appeals of Indiana, First District.
October 18, 1983.
Rehearing Denied November 30, 1983.
*1254 Howard S. Young, Jr., Young & Young, Andrew Jacobs, Sr., Indianapolis, for plaintiff-appellant.
Lloyd H. Milliken, Jr., Locke, Reynolds, Boyd & Weisell, Linley E. Pearson, Atty. Gen., Richard E. Hagenmaier, Bruce L. Kamplain, Deputy Atty. Gen., Indianapolis, for defendants-appellees.
NEAL, Judge.

STATEMENT OF THE CASE
Appellant-plaintiff, E. Robert Jacobs (Jacobs), appeals an adverse summary judgment rendered in the Johnson Circuit Court in his suit for defamation against City of Columbus (City), State of Indiana (State), John Myers (Myers), Ronald Chandler (Chandler), and Richard Barker (Barker).
We affirm.

STATEMENT OF THE FACTS
A full statement of summary judgment proceedings consisting of evidentiary material, including depositions, affidavits, interrogatories and exhibits, is necessary for an understanding of the relatively narrow issues on appeal. Upon the completion of his assistance in morning surgery at the Bartholomew County Hospital in Columbus on February 4, 1977, anesthesiologist Dr. Griffith Marr, a member of the hospital medical staff, commenced eating his lunch of fish and peas in the surgeons' lounge near the operating room. The food, covered by a metal lid bearing his name on a tape, was brought at his direction by an aide from the hospital cafeteria and placed along with lunches of other doctors in an autoclave to be kept warm. Although he was aware, when he commenced to eat, of a white powdery substance on the peas which he assumed to be seasoning, after two or three bites he belatedly perceived that the peas bore an unpleasant, strange metallic taste. Alarmed that the food was contaminated with some harmful substance, he hastened to the washroom and induced vomiting. Nevertheless, he became ill and was unable to complete afternoon surgery. After hospitalization for 48 hours, he was able to return home. While analysis of the food revealed the presence of aconitine, a deadly poison not stocked at the hospital, no trace of the poison was found in the analysis performed on Marr's blood and urine. Although Marr, in his deposition, could not remember making such an accusation, the Indianapolis Star carried a news story stating that Marr exclaimed, "Jake finally got me". Jacobs, a staff surgeon at the hospital, was frequently referred to by the sobriquet "Jake".
Several weeks prior to the Marr poisoning, Dr. Larry Wilhite, also an anesthesiologist *1255 and a member of the medical staff, suffered strange mood-changing sensations in the hospital which were suspected to be the result of the ingestion of a hallucinogenic drug placed in his food or drink by another anesthesiologist, Dr. Lindley Gammell, also a member of the hospital medical staff. Patricia Stillwell, then a surgical nurse at the hospital, admitted purchasing such a hallucinogenic drug, purple mescaline, from undisclosed underworld sources at Gammell's request and giving it to Gammell.
Upon request by the hospital, an investigation into the Marr poisoning was commenced by Indiana State Police Officer Ronald Chandler; later, Indiana State Police Officer Richard Barker and Columbus Police Officer John Myers joined the investigation. Eventually, the Bartholomew County Prosecuting Attorney, Richard Donnelly, contributed the resources of his office, and because of the grave implications, the hospital trustees appropriated money to aid in the cost of the investigation.
Inasmuch as the food was accessible to tampering by many people, a large number of the hospital employees, former hospital employees, and members of the medical staff, including Marr and Jacobs, were interrogated and given polygraph tests. All persons were suspect, and yet there was no particular suspect. The investigators naturally focused their efforts upon the interrelation among persons associated with the hospital. In the course of the investigation, the officers discovered a 1970-72 alleged conspiracy between Gammell and Jean Girone, a surgical nurse, to murder her husband, Tony, an electrician. Gammell and Girone, both married, were having an affair, and during that time Girone, the mother of three and under psychiatric care for mental and emotional illness, attempted suicide twice. Jacobs, a reputed close professional associate of Gammell, treated her on both occasions. These investigations thereafter proceeded somewhat together, and several of the same dramatis personae occasionally wandered in and out of both cases. An indictment was obtained against Gammell for attempted tampering and bribery.
Rumor and gossip abounded, and a number of the stories found their way into the news media. One such story recounted a professional quarrel in the medical staff existing between a faction composed of Jacobs and Gammell and another faction composed of other physicians, surgeons and anesthesiologists. Marr and Wilhite were included in the latter group.
In addition to the standard gossip and rumors of affairs, triangles, professional jealousies, and mindless bickering existing among the employees and the medical staff of the hospital, Officer Myers testified in deposition that he was privy to a rumor obtained from a fellow officer, Billie Keith Monroe, that Jacobs had homosexual tendencies. In particular, Monroe related that a girl with second or third-hand knowledge told him that Jacobs was found in bed with one Roger Johnson in Jacobs' apartment. Johnson was a salesman of emergency vehicle equipment, a township trustee, a rumored associate of Jacobs in a tavern known as the Office Lounge, and a security officer at the hospital at the time of the poisoning. Since the officers were examining the interrelation among persons associated with the hospital, this information, of course, was of some interest. It was in this sullied ambience, described by one media as "a bizarre mystery  rivaling any soap opera", that the officers plied their thankless trade, and the alleged defamation occurred during the course of that investigation.
The amended complaint stated five separate instances of alleged defamation, each in a separate count.
Count I charged defamation of Jacobs by Myers on October 7, 1978, during an interview with Pamela Stillwell in San Diego about the two cases wherein Myers allegedly said "Dr. Jacobs and Roger Johnson were having a homosexual affair, and Dr. Jacobs played the male role." The alleged statement was not part of the taped interview or the formal statement made by Stillwell. The deposition of Stillwell recites that Myers had asked her about her knowledge of the relationship between Jacobs and *1256 Johnson, and she said she did not know of it. She stated that at that point Myers made the alleged defamatory statement. Myers' version, in his deposition, was that he was merely questioning her. Jacobs was also Stillwell's physician, and she later called his office concerning her ailment. She then relayed the above alleged defamatory statement to a nurse, Sandy Royer, who in turn, informed Jacobs.
Count II charges defamation by Myers on October 10, 1978, in an interview with Jean Girone in Murfreesboro, Tennessee. As in the Stillwell interview, the alleged defamatory statement was not part of the taped interview or formal statement. The alleged defamatory imputation was that Myers and Chandler stated to Girone that Jacobs was "A/C-D/C", which in street argot refers to being both homosexual and heterosexual. During her deposition, for which legal counsel was recompensed by Jacobs, Girone admitted that the officers interviewed her concerning events in the Marr and Gammell investigations and inquired about many persons at the hospital, including employees, Jacobs, Marr, and other members of the medical staff. She stated that she was unsure how the subject of Jacobs' sexual preference came up or whether the alleged defamatory words were used by Myers in the form of a statement or as a question. The officers' version of the incident, as recorded in their depositions, states that they merely asked Girone about the relationship but made no accusations. Later, Pamela Stillwell called Girone, at Gammell's request, to assure her that she, Stillwell, did not have an affair with Gammell. In that conversation, she informed Girone of her interview with the officers. Girone then told Gammell of her own conversation with the police, and Gammell told Jacobs.
Count III concerns a statement reputedly made by Barker to Roger Johnson at a meeting to discuss the Marr case. Johnson's affidavit states that Barker said:
"Well, we have got Dr. Gammell and we are going to get Dr. Jacobs too. I (Johnson) asked if Dr. Jacobs was a suspect in the Marr case. He replied "no, but he is dirty and we have got him and his girlfriend on a felony. I (Johnson) believe he said drug felony and they are both going to jail."
Johnson stated that he promptly told Jacobs of the discussion. Barker categorically denied the statement and stated in his deposition that the alleged statement grew out of an interview with Johnson about the Marr case in which Johnson was asked to take a polygraph test.
In Count IV, Jacobs alleges that Barker, on December 15, 1978, stated to Sheriff McKinney of Bartholomew County,
"Oh Jesus Christ, are we going to take Dr. Jacobs down  he is guilty of a felony and he is selling drugs out of his office and he is going to jail."
The allegation is supported by McKinney's affidavit. Barker in his deposition said that he and the Sheriff were talking about the investigation on the day Gammell was indicted. The Sheriff stated that Jacobs was his friend. Barker replied that "... if Jacobs was dirty he would be arrested like anyone else". He was not seeking information from the Sheriff who was not part of the investigation.
Count V is based on statements made at a press conference orchestrated by the prosecuting attorney, Donnelly. The charge specifically concerns a December 16, 1978 article in The Republic, the Columbus newspaper, in which Myers, Chandler and Donnelly allegedly made statements regarding the Marr poisoning investigation. Paraphrased, the article reported Myers and Chandler stated during the interview that there was a lot of pressure on them to stop the investigation. The officers further revealed that they had received threats that they would lose their jobs and be thrown in jail. They said that some persons wanted to "burn them" and "wanted to see them fired". One particular threat  "we have presents for you"  was referred to as "being sealed in blood". Myers and Chandler concluded by saying that they were aware of the source of the threats, but they would not reveal names at that time. The news article also recounted a statement by the *1257 prosecuting attorney of a similar import which cited pressure on him to drop the investigation. Donnelly added that the officers had been threatened by civil lawsuits as well. Jacobs' name was not mentioned in the article. However, in his amended complaint, he alleged that the words were spoken of him and so understood, and that the defendants phrased the statement to convey the meaning that he was guilty of attempted murder, or assisting an attempted murder or both.
Myers essentially admitted in his deposition the statements attributed to him and Barker. He stated in his deposition that he felt, but did not say, that Jacobs was threatening the investigation. He explained that his opinion was based upon information he had received from other people as well as a tape recording of Jacobs' telephone conversations with Girone at Murfreesboro. The officers had given Girone a recorder to tape any conversation with Gammell, and without any instructions from the officers, she taped Jacobs' conversation with her on November 16 and 17, 1978. On the former date, Jacobs asked Girone about the statements and questions of the officers and said that he wanted to fly down to Murfreesboro with a lawyer and reporter and take her statement. When Girone was reluctant to comply with the arrangements, he reminded her that he had saved her life after her suicide attempts. Referring to the officers as "scum" with "low IQ's" and "dirty of the dirties", he said he wanted to get them "reprimanded" and "straightened out". Though Girone finally agreed to give a statement, the next day, upon advice of counsel, she changed her mind and related her decision to Jacobs in a subsequent telephone conversation (November 17) which was also taped. Jacobs reiterated that he was interested in getting the two policemen "straightened out" and get them to "stop what they were doing". He threatened to "burn them". He concluded by saying that he wanted to serve Myers and Chandler a notice of a suit on Christmas Eve for a Christmas present.

GENERAL CONSIDERATIONS AND ISSUES FOR DEFAMATION
Jacobs filed his action for defamation against the police officers, the state, and the city on January 28, 1980, which complaint was answered and put at issue by all defendants. An amended complaint was filed which was answered on January 5, 1982 by the state and its officers wherein they asserted immunity under Ind. Code 34-4-16.5-3(6) and (7). They also filed a motion to dismiss and a motion for judgment on the pleadings. The city and its officers had previously filed its motion to dismiss on December 23, 1981, supported by depositions which asserted immunity under Ind. Code 35-4-16.5-3(7), and it also asserted a defense under Ind. Code 34-4-16.5-5(a) which provides that a judgment or settlement with respect to a governmental entity bars any action against the employee.
While the suit was pending, two cases, Seymour National Bank, Gd. v. State, (1981) Ind., 422 N.E.2d 1223, on reh. 428 N.E.2d 203; and Burks v. Bolerjack, (1981) Ind., 427 N.E.2d 887, both construing the Tort Claims Act, were decided by the Indiana Supreme Court which decisions significantly altered the strategic aims of all parties. Bolerjack construed Ind. Code 34-4-16.5-5(a) which states:
"A judgment rendered with respect to or a settlement made by a governmental entity bars an action by the claimant against an employee whose conduct gave rise to the claim resulting in that judgment or settlement."
Bolerjack applied that section to a situation where in a joint suit, judgment was rendered on a motion to dismiss in favor of the governmental entity for failure of the claimant to file a proper tort claim notice. The court held that since the entity was entitled to judgment, under that section the employee was entitled to judgment also. It held that "judgment" as used in the statute refers to any judgment.
In Seymour, supra, the Supreme Court construed Ind. Code 34-4-16.5-3(7), an immunity section, which provides:

*1258 "A governmental entity or an employee acting within the scope of his employment is not liable if the loss results from
* * * * * *
[t]he adoption and enforcement or failure to adopt or enforce a law, including rules and regulations, unless the act of enforcement constitutes false arrest or false imprisonment."
The court in Seymour, in a literal interpretation of the above section, granted immunity to a state police officer and the state from liability for the death of a third party resulting from the pursuit by the officer of a fleeing suspect at speeds up to 100 m.p.h. on the basis that the officer was enforcing the law. On petition for rehearing, the court stated: (428 N.E.2d 204)
"The language of the statute as amended is clear. The State of Indiana and its employees are not liable for losses resulting from the enforcement of or failure to enforce a law, unless such enforcement constitutes false arrest or false imprisonment.
* * * * * *
However, an employee's acts, although committed while engaged in the performance of his duty, might be so outrageous as to be incompatible with the performance of the duty undertaken. In such case, it cannot be said that an injury resulting therefrom resulted from the performance of the duty. Such acts, whether intentional or willful and wanton, are simply beyond the scope of the employment." (Our emphasis)
Thereafter, while defense motions were pending, Jacobs on May 5, 1982, filed a pleading entitled "Plaintiff's Dismissal of Actions as Against Defendants, State of Indiana and the City of Columbus Only, Or In The Alternative, His Motion for Leave to Dismiss". The pleading recited as reasons for the dismissal that under Seymour, supra, and Ind. Code 34-4-16.5-3(7), the governmental entities were immune, and he could not procure a judgment on the merits against them and therefore requested dismissal without prejudice. On the date of filing, without notice of hearing, the court ruled, "Plaintiff's dismissal of actions against defendant, State of Indiana and City of Columbus only is granted and cause is dismissed as to defendants State of Indiana and City of Columbus only".
Jacobs concedes that under Seymour, supra, the state and city are immune. However, he argues that the officers conduct was "outrageous" and that they thereby, under Seymour, forfeited any protection under the tort claim immunity provision, or any protection at all under the Tort Claims Act, and would remain personally liable. Therefore, as he candidly admits, to escape the inevitable judgment in favor of the governmental entities on their pending defense motions, which then could arguably be used as a bar to continued actions against the officers under Bolerjack, supra, and Ind. Code 34-4-16.5-5(a), Jacobs sought to exercise his right under Ind.Rules of Procedure, Trial Rule 41(A) to dismiss when it became clear that he could not "procure an adjudication" against the entities "on the merits". T.R. 41(A) as relevant here is as follows:
"(A) Voluntary Dismissal: Effect thereof.
(1) By plaintiff-by stipulation. Subject to contrary provisions of these rules or of any statute, an action may be dismissed by the plaintiff without order of court:
(a) by filing a notice of dismissal at any time before service by the adverse party of an answer or a motion for summary judgment, whichever first occurs.

Unless otherwise stated in the notice of dismissal or stipulation, the dismissal is without prejudice, except that a notice of dismissal operates as an adjudication upon the merits when filed by a plaintiff who has once dismissed in any court of the United States or of any state an action based on or including the same claim. The provisions of this subdivision shall not apply if the plaintiff in such action could not effectuate service of process, or otherwise procure adjudication on the merits.

*1259 (2) By order of Court. Except as provided in subsection (1) of this subdivision of the rule, an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper." (Our emphasis)
In response, the governmental entities and the officers sought to have the May 5 dismissal set aside and gain the inevitable judgment which in turn could be used as a bar to the continued action against the officers under Ind. Code 34-4-16.5-5(a) and Bolerjack, supra. They were successful, and the trial court vacated the dismissal against the city and state. On the same date, the trial court treated all pending defense motions as motions for summary judgment and granted summary judgment in favor of all defendants on all issues. Summarized, the findings of the court are as follows:
Counts I and II: Interviews with Stillwell and Girone.
1. Judgment for State, City, Chandler, Myers. Myers and Chandler were police officers employed by the State and City, and were conducting a criminal investigation. Therefore, they were engaged in the enforcement of the law and they and the governmental entities have immunity from suit under Ind. Code 34-4-16.5-3(7) and Seymour, supra.

2. As an alternative ground, the court held that since the plaintiff brought suit against the governmental entity as well as the officers, when judgment is entered for the entities, its cause of action must, under Ind. Code 34-4-16.5-5(a) and Bolerjack, supra, be barred as against the officers.
Counts III and IV: Declarations of Barker to McKinney and Johnson.
1. Judgment for City. Barker was not an employee of the city, and therefore city is entitled to judgment.
2. Judgment for Myers. There was no conspiracy. Since judgment was entered for the city, by virtue of Ind. Code 34-4-16.5-5(a) and Bolerjack, supra, summary judgment must be entered for Myers.
3. Judgment for Chandler. Barker and Chandler are co-employees of state and Chandler is therefore not liable for Barker's torts.
4. Judgment for State. Barker acted within the scope of his authority while engaged in the enforcement of the law. Under Seymour, supra, the state is immune and is entitled to summary judgment.
5. Judgment for Barker. Barker, acting in the course of his employment, was engaged in the enforcement of the law. Since the state was granted judgment under the authority of Bolerjack, supra, and Ind. Code 34-4-16.5-5(a), Barker is entitled to summary judgment.
Count V: News conference.
The court held that when the complained of words are given their natural meaning, it must be concluded that as a matter of law, they are not defamatory, that Count V fails to state a defamation per quod, and that all defendants were entitled to judgment.
Jacobs concedes that if the conduct of the officers was not outrageous within the context of Seymour, supra, then the summary judgment must be affirmed and all other issues are moot. We view the statement in Seymour, supra, regarding outrageous conduct as dicta. The court used the phrase "might be so outrageous ...", but left the parameters of that expression, or the definition or degree thereof, undecided. It is the position of Jacobs that the conduct of the officers was "outrageous"; thus, their acts were beyond the scope of their employment. They therefore lost their employee status and are not entitled to any benefit of the Tort Claims Act, the immunities under Ind. Code 34-4-16.5-3, or the protection or benefit of Ind. Code 34-4-16.5-5(a) (Judgment with respect to entity barring claims against employee); (b) (Payment by the entity of any judgment against employee); and (c) (Defense by entity of employee). The protection or benefit of Ind. Code 34-4-16.5-5(a), *1260 (b) and (c), as well as Ind. Code 34-4-16.5-3(7) is predicated upon the employee's action being within the scope of his employment. Therefore, he concludes that Bolerjack, supra, is inapplicable to the case.

ISSUES
The issues restated by us are as follows:
I. Whether the conduct of the officers was outrageous within the context of Seymour National Bank, Gd. v. State, (1981) Ind., 422 N.E.2d 1223, on reh. 428 N.E.2d 203.
II. Whether Jacobs had a right to dismiss under Ind.Rules of Procedure, Trial Rule 41(a)(1) and escape the consequences of Burks v. Bolerjack, (1981) Ind., 427 N.E.2d 887.
III. Whether the alleged statements in Count V were defamatory as a matter of law.

Issue I. Outrageous conduct.
The question here is whether or not the officers conduct was outrageous within the context of Seymour, supra. Resolution of that question requires an examination of the Tort Claims Act, its purposes, and the cases decided thereunder. The effect of the holding in Seymour was that a 100 m.p.h. car chase was deemed not so "outrageous" as to be incompatible with the performance of the duty undertaken and thus not beyond the scope of employment. Other than the dicta in Seymour, we have found no case which qualifies the immunity granted in Ind. Code 34-4-16.5-3.
The immunity in issue is a residue of the sovereign immunities enunciated in pre-Campbell cases. See Campbell v. State, (1972) 259 Ind. 55, 284 N.E.2d 733; Gonser v. Board of Commissioners, (1978) 177 Ind. App. 74, 378 N.E.2d 425; Livingston v. Consolidated City of Indianapolis, (1979) Ind. App., 398 N.E.2d 1302. The effect of sovereign immunity was stated in a pre-Tort Claims Act case of Miller v. Griesel, (1974) 261 Ind. 604, 308 N.E.2d 701:
"Sovereign or governmental immunity is a complete bar to an action which will be interposed by a government defendant and will prevent liability even in a situation where tortious conduct might otherwise be clearly established."
Miller, supra 308 N.E.2d at 704.
The purpose of immunity under Ind. Code 34-4-16.5-3 was stated in Foster v. Pearcy, (1979) 270 Ind. 533, 387 N.E.2d 446, cert. denied, 445 U.S. 960, 100 S.Ct. 1646, 64 L.Ed.2d 235, a case wherein the Marion County Prosecuting Attorney and his deputy were sued for defamation resulting from statements made by the deputy at a news conference concerning a grand jury action in a drug investigation. The trial court granted an Ind.Rules of Procedure, Trial Rule 12(B)(6) motion, and the Supreme Court affirmed, stating that the prosecuting attorney was duty-bound to keep the public informed of his activities. The court continued:
"We therefore conclude that since it is a prosecutor's duty to inform the public as to his investigative, administrative and prosecutorial activities, the prosecutor must be afforded an absolute immunity in carrying out these duties.
While we base our decision primarily on the common law immunity traditionally accorded to prosecuting attorneys, we also note that the duty to inform the public can be characterized as a discretionary function and thus would fall within the absolute immunity granted under the Indiana Tort Claims Act. IC Sec. 34-4-16.5-3(6) [Burns Supp. 1978]. This decision will insure that the prosecutor will be able to exercise the independent judgment necessary to effectuate his duties to investigate and prosecute criminals and to apprise the public of his activities. It will also allay the apprehensions about harassment of prosecuting attorneys from unfounded litigation which deters public officials from their public duties.
We express no opinion as to the liability of prosecuting attorneys or their deputies for acts outside the scope of their authority. We hold only that where, as here, the acts are reasonably within the general *1261 scope of authority granted to prosecuting attorneys, no liability will attach."
Foster, supra 387 N.E.2d, at 449. See also Livingston v. Consolidated City of Indianapolis, supra, concerning the grant of immunity under Ind. Code 34-4-16.5-3(5) in a malicious prosecution suit against police officers. In this latter case, we emphasized that the purpose of immunity is to shield officers and the public body from retaliatory and intimidating litigation initiated by persons sensitive to investigation for the purpose of deterring the officers from the performance of their duty.
Jacobs' argument consists principally of a review and his characterization of evidentiary materials presented for and against the motion for summary judgment. For the purpose of review of a ruling on such a motion, we must accept that evidence which is in his favor as true. See Barnes v. Wilson, (1983) Ind. App., 450 N.E.2d 1030, for the standard of review for a summary judgment.
Jacobs essentially argues that he has made out a prima facie case of defamation. He argues that there was sufficient evidence in the record to present a genuine issue of fact that the defamatory words were malicious, intentional, willful and wanton; they were not a slip of the tongue, but calculated to serve the common cause of all three officers. Albeit, such fact in and of itself would not interdict the legislative grant of immunity under Ind. Code 34-4-16.5-3(7) or the other defenses under Ind. Code 34-4-16.5-5.
Malice can be an element of defamation. Peterson v. Culver, (1980) Ind. App., 402 N.E.2d 448. But see Weenig v. Wood, (1976) 169 Ind. App. 413, 349 N.E.2d 235; Prosser, Law of Torts at 772 (4th Ed. 1971) (stating that the existence of malice "remains important where the exercise of a qualified privilege is in question, and it may affect the measure of damages to be imposed particularly as to punitive damages, but it is not at all essential to liability in the first instance.") Since immunity exists for all torts under Ind. Code 34-4-16.5-3(7) except assault and battery and false imprisonment, the mere proof of the elements of defamation would necessarily be insufficient to abrogate the aegis of immunity under the theory of outrageousness, for we may infer that the legislature and the Supreme Court were aware of the element of malice in some torts and created no exception regarding such torts. Indeed, we applied immunity in Livingston v. Consolidated City of Indianapolis, supra, (transfer denied) involving a malicious prosecution suit against officers where malice was also an element.
Jacobs cites no authority other than dictionary definitions defining outrageous conduct, and he limits his argument to the word "outrageous". We read Seymour, supra, to mean that the words "so outrageous" are modified by the phrases "as to be incompatible with the performance of the duty undertaken" and "simply beyond the scope of the employment". Pearcy v. Foster, supra, applied tort claim immunity where the conduct was in the reasonable scope of general authority. See also, Restatement (Second) of Agency, Sec. 228, (1958). There is nothing in the evidentiary material here to suggest that the officers went beyond their general investigative authority, or were motivated by anything that could be termed "frolic and detour" or personal interest. Faced with an Agatha Christie-type factual melange, the officers entered upon the investigation of the Marr poisoning, a criminal act, as was their duty as police officers, and pursued a typical method of investigation familiar to knowledgeable persons, which included interrogating, checking, verifying, assessing and discarding information obtained from various sources including rumor, gossip and other endless minutiae. It is likewise known that a resourceful officer's very intuition or deduction may inspire an area of investigation. A familiar interrogation technique exists by which an officer may challenge or shock a recalcitrant witness with a declaration of fact designed to frighten or inveigle information from him. The officer may even gain a witness's confidence by astutely pretending possession of knowledge or information *1262 that he does not in fact have, thus leading the witness to divulge the sought-after information.
Insomuch as the purpose of immunity is to insure that officers will feel confident to investigate fearlessly criminal activity without fear of retaliatory and disruptive litigation, such purpose cannot be achieved if the officer risks personal ruin by the form of each question he may ask of a hostile witness or the witness' version of an interview. The same may be said with respect to conversations with fellow police officers. We, therefore, do not propose to impede police officers' efforts by diminishing immunity on the facts of this case.
Jacobs himself alleged in the tort claim notice, the complaint, and the amended complaint that the officers were acting within the scope of their authority, though at a time when he hoped that the entities' deep pockets were an attainable goal. He discovered that the acts were outrageous and beyond the scope of the officers' authority only after the Supreme Court's decision in Seymour, supra. The trial court found that the acts of the officers were committed while engaged in the enforcement of the law and in the scope of their employment. We agree.
Counts I, II, and III were based upon interviews by the police officers with persons they had reason to believe possessed useful information. Count IV was based upon a conversation with the Sheriff of Bartholomew County in whose jurisdiction the Marr poisoning occurred. We disagree that the alleged conduct was "so outrageous as to be incompatible with the performance of the duty undertaken", and "simply beyond the scope of the employment". The type of activity which is the basis of Count V, the press conference, was specifically declared immune in Pearcy v. Foster, supra. One can scarcely reconcile the holding in that case with outrageousness. Implementation by us of Jacobs' argument would amount to a wholesale rewriting of the tort claims immunity section. Ind. Code 34-4-16.5-3, and Ind. Code 34-4-16.5-5(a)(b) and (c). It would also lay the seed for the proposition that if the act of the governmental employee could be characterized as sufficiently outrageous, then the act would be beyond the scope of employment, a necessary element, and in each such case the entity would be absolved. This possibility could then become a defense ploy for governmental entities. Such is not the intent of the Tort Claims Act.

Issue II: Dismissal
We have already held that the conduct of the officers was not outrageous within the context of the dicta in Seymour, supra. Jacobs acknowledges that his dismissal was under T.R. 41(A)(1), but he argues that he had a right to dismiss when he could not "procure adjudication" against the entities "on the merits". Trial Rule 41(A)(1)(a) permits voluntary dismissal as a matter of right any time before the filing of an answer or motion for summary judgment. Jacobs attempts to escape the effect of that section with the aid of the last line thereof, which states:
"The provision of this subdivision shall not apply if the plaintiff in such action could not effectuate service of process, or otherwise procure adjudication on the merits." (Emphasis added)
He then claims, with commendable creativity, that since under Seymour supra, judgment in favor of the entities was unavoidable, then he cannot procure a judgment on the merits. Bolerjack, supra, also involved a procedural judgment on a motion to dismiss because of failure of notice. We hold that the mere fact that Jacobs would have assuredly lost the litigation against the entities had he persevered does not mean that the adjudication could not have been had on the merits. The judgment on the merits simply would have been adverse to him. He also argues, without authority, that the judgment in favor of the entities would have been on the basis of status  immunity  not on the merits  blameworthiness. We hold that Bolerjack, supra, disposed of that argument: the court said any judgment rendered with respect to the governmental entity bars an action against the employee. In addition, the language of the *1263 quoted last sentence relied upon by Jacobs refers to the one dismissal rule. 3 W. Harvey, Indiana Practice, Sec. 41.1 at 215 (1972). Entering a judgment after dismissal for failure to state a claim is an adjudication on the merits. Ragnar Benson, Inc. v. Jungclause Co., Inc., (1976) 167 Ind. App. 628, 632, 352 N.E.2d 817; Coghill v. Badger, (1981) Ind. App., 418 N.E.2d 1201.
Here the issues were once closed, and an answer and motion for summary judgment had been filed to the amended complaint. Therefore, Jacobs was not entitled to dismiss as of right according to the clear language of T.R. 41(A)(1)(a), and the trial court did not err in correcting its error by setting aside his May ruling.
Jacobs also attempts to distinguish Burks v. Bolerjack, supra, from the instant case in that Bolerjack was an assault and battery and false imprisonment case where neither the officers nor the entities were immune. Therefore, he says, immunity or outrageousness was not an issue, and Bolerjack did not decide the question here; that is, whether a judgment under Ind. Code 34-4-16.5-5(a) in favor of an entity is a bar to a suit against the employee where the rights and immunity of the employee under the Tort Claims Act were forfeited by outrageous conduct. Bolerjack held that any judgment rendered with respect to the entities bars an action against the employee. Again, we do not propose to extend the rule on the facts of the case or rewrite the Tort Claims Act.
Though Jacobs states in his brief under the statement of the issues, and elsewhere, that "plaintiff based his dismissal upon T.R. 41(A)(1)", he belatedly asserts without cogent argument or citation of authority that the court abused its discretion under T.R. 41(A)(2). Because of the condition of the record we decline to address that assertion. Brinson v. Sheriff's Merit Board of Jefferson County, (1979) Ind. App., 395 N.E.2d 267.

Issue III: Press Conference.
The Republic, a newspaper, on December 16, 1978, printed a news story entitled "Poison Inquiry Goes On", "Officers Cite Pressure". The article said that "threats of violence and civil lawsuits, as well as `pressure' on governmental officials have been used to remove two officers from an investigation of the ... poisoning of Dr. Griffith Marr ...". The article quoted statements made by Donnelly, as well as Myers and Chandler. Since Donnelly is not part of this suit, we will not address his statements. The statements attributed to Myers and Chandler are as follows:
"There has been a lot of pressure to get us to stop investigating.
* * * * * *
Myers and Chandler said they have received threats that they will lose their jobs and be thrown in jail if they continue to investigate the case. The officers said that they have been told that some persons want to `burn them' and `want to see them fired'.
They quoted one threat partially this way: `We have a present for you'. They said another threat was presented to them as being `sealed in blood'.
* * * * * *
The three officials said that they were aware of the source of the threats and know who is exerting the pressure. They said they would not reveal the names at this time."
Count V of the amended complaint alleged that the words were spoken by Myers and Chandler of Jacobs and so understood, even though Jacobs' name was not mentioned. Jacobs then alleged:
"The defendants phrased such statements to convey the meaning that plaintiff was guilty of attempted murder, or assisting an attempted murder, or both."
The trial court ruled that "when the complained of words are given their natural meaning, it must be concluded as a matter of law that they cannot be construed in the manner the plaintiff alleges", and entered summary judgment for all defendants.
Jacobs' argument in his brief seeks to enlarge the allegation of the imputation of attempted murder to include threatened violence, obstructing the investigation, tampering, *1264 as well as encompass the words spoken by the prosecuting attorney, and the editorial observations of the newspaper. We will address only the allegations of his complaint and the statements made by the officers.
The only question then is whether the words taken in their entirety and understood in their plain and natural import, convey the meaning that Jacobs "was guilty of attempted murder, or assisting an attempted murder or both". For the purpose of this discussion we accept Jacobs' argument that it is understood that the statements referred to Jacobs and were so understood by persons who read it.
We first note that while it would appear that the press conference statements would be immune under the rule in Foster v. Pearcy, supra, such argument is not advanced by any of the parties. Secondly, while this alleged information was not mentioned in the tort claim notice with any identifiable specificity, as required by Ind. Code 34-4-16.5-9, such error was not raised in the trial court and made a part of the reasons stated by the court in its decision. We will not address those issues, but will confine our discussion to matters alleged in the amended complaint and determined in the trial court.
The parties agree that the complained-of words, if at all actionable, are actionable as defamation per quod. As explained in Judge Faulconer's concurring opinion in Gibson v. Kincaid, (1966) 140 Ind. App. 186, 201, 221 N.E.2d 834, an opinion which has been subsequently cited as definitive in this area, words are deemed actionable per quod when they acquire a defamatory meaning when placed in context or connected with extrinsic facts or circumstances.
In a cause of action for defamation per quod, the words must be examined for their natural meaning. "Words must be taken in their entirety and understood in their plain and natural import, according to the idea they are calculated to convey to whom they are addressed." Id. at 204, 221 N.E.2d 834, citing Garrett v. Bissell Chilled Plow Works, (1900) 154 Ind. 319, 320, 56 N.E. 667. The natural meaning rule continues to prevail in Indiana. ("In determining whether words are actionable, the words allegedly used are to be given their natural and ordinary meaning under the circumstances under which they were uttered."), Local 15 of the Independent Workers of Noble County v. International Brotherhood of Electrical Workers, (N.E.Ind. 1967) 273 F. Supp. 313, 320.
Whether an article or statement is capable of possessing a defamatory meaning is initially a question of law for the trial court to decide. Cochran and Daley v. Indianapolis Newspapers, (1978) 175 Ind. App. 548, 553, 372 N.E.2d 1211; citing Henderson v. Evansville Press, Inc., (1957) 127 Ind. App. 592, 142 N.E.2d 920. If the words are ambiguous so that it is possible to construe both a defamatory and non-defamatory meaning, then the case should properly go to the jury. Id.
The trial court effectively determined that there was no ambiguity in the words and statements of the officers, and they could not be imbued with the defamatory meaning suggested by Jacobs in his complaint. The finding is correct in light of the "natural meaning rule". It requires a tortured construction to glean a meaning from the statements that Jacobs was guilty of attempted murder or assisting attempted murder. A false imputation of criminal activity is defamatory, but the imputation must bear some reasonably close relation to the definition of the crime. Cochran, supra. This bears none.
For the above reasons this cause is affirmed.
Judgment affirmed.
ROBERTSON, P.J., and RATLIFF, J., concur.