The SEYMOUR NATIONAL BANK as guardian for Timothy Clyde O'Sullivan, The Seymour National Bank, as Special Administrator of the Estate of Deborah O'Sullivan, John L. O'Sullivan, Plaintiffs-Appellants,

v.

STATE of Indiana, Defendant-Appellee.

No. 1–578A125.

Court of Appeals of Indiana, In Banc, First District.

Jan. 31, 1979.

---

Kenneth A. Layton, Montgomer, Elsner & Pardieck, Seymour, for plaintiffs-appellants.

Lloyd H. Milliken, Jr., Locke, Reynolds, Boyd & Weisell, Indianapolis, Thomas C. Bigley, Jr., Sharpnack, Bigley, David & Rumple, Columbus, Theodore L. Sendak, Atty. Gen., Richard G. Potter, Deputy Atty. Gen., Indianapolis, for defendant-appellee.

ROBERTSON, Judge.

Plaintiffs-appellants Seymour National Bank, as guardian for Timothy Clyde O'Sullivan and as special administrator of the Estate of Deborah O'Sullivan, and John L. O'Sullivan (collectively referred to herein as O'Sullivan) appeal from a grant of summary judgment in favor of defendant-appellee State of Indiana (State).

We reverse.

O'Sullivan sought recovery against the State for injuries allegedly due to the negligence and/or willful and wanton misconduct of an Indiana State Trooper while in

the performance of acts within the scope of his employment.[1] Since issues of fact are not pursued by the parties, the posture of this case is reflected by the judgment of the trial court:

This cause having been submitted to the Court on the motion for summary judgment filed by the defendant, the State of Indiana, and upon pleadings, interrogatories and answers thereto, and affidavits in support of said motion for summary judgment, and the Court, having heard oral arguments thereon and having considered briefs filed by the parties herein, now finds:

1. On November 28, 1974, Sargent L. Richey (hereinafter Trooper Richey) was employed by the State of Indiana as a State Trooper for the Indiana State Police. Sometime after 11:00 A.M. on said date in the course and scope of his employment, Trooper Richey was on patrol in Jackson County, Indiana near the Uniontown exit of Interstate Highway 65.

2. At about the same time, C. W. Leffler (hereinafter Trooper Leffler) was also on patrol as a State Trooper on Interstate 65, heading in a northerly direction at a location north of Trooper Richey. In the course of his duties Trooper Leffler observed a Chevrolet Nova automobile proceeding southbound on Interstate 65, at what appeared to be an excessive rate of speed and equipped with a rear bumper in violation of the statute regulating bumper heights (IC 1971, 9–8–6–37.5). Because of traffic conditions Trooper Leffler deemed it inadvisable to move from the northbound lanes to the southbound lanes of Interstate 65 in order to pursue the Nova. Knowing that Trooper Richey was on patrol to the south, Trooper Leffler radioed Trooper Richey and advised him of the situation. Trooper Richey then took up a position at the Uniontown exit on Interstate 65 so that he could observe the Nova as it passed.

3. A short time later, the Nova came into Trooper Richey's view and although at this time it was not being operated at an excessive rate of speed, the bumper height appeared to be excessive. As soon as traffic permitted, Trooper Richey drove on to Interstate 65 and proceeded to follow the Nova and thereafter decided to stop it for investigation of the rear bumper height.

4. When Trooper Richey was finally able to position his vehicle beind [sic] the Nova, the driver, later identified as John J. Bunce, suddenly pulled around the vehicle in front of him. Immediately he cut back in front of the passed vehicle and maintained a position just a short distance ahead of the passed vehicle. Trooper Richey attempted to follow the Nova, but because of the position of the Nova in relation to the vehicle behind it, he was unable to get his police vehicle in behind the Nova to stop it with the minimum disruption of the traffic flow. After the lapse of some time Trooper Richey was able to get the attention of the driver of the car immediately behind the Nova. This driver reduced his speed permitting Trooper Richey to position his vehicle behind the Nova. He then signalled John Bunce to pull off the driving lane.

5. Trooper Richey stopped his vehicle a short distance behing [sic] the Nova and as he did so he observed what appeared to be bullet holes in the trunk lid. He also noticed that Mr. Bunce seemed to be fumbling with something down on the left side of the front seat. He proceeded cautiously to the left front door of the Nova positioning himself so that he could observe both southbound traffic and the movements of Mr. Bunce. When Mr. Bunce was unable to produce either a driver's license or vehicle registration, Trooper Richey requested him to come back to the police car where an identifica-

---

1. O'Sullivan also sought to hold the State liable for the negligent training of State Troopers. Having found reversible error on other grounds, we decline to resolve whether he may

recover on that theory. With respect to that theory, however, see *Thomas v. Johnson*, 295 F.Supp. 1025 (D.C.D.C.1968); *Snell v. Murray*, 117 N.J.Super. 268, 284 A.2d 381 (1971).

tion check could be made. Bunce started to open the door in apparent compliance with Trooper Richey's request, but instead of getting out of the car, Bunce quickly accelerated and drove off at a high rate of speed bumping and knocking Richey backward.

6. Trooper Richey rushed to his car which at the time was located approximately 1¼ to 1½ miles north of the Crothersville exit. As soon as traffic permitted and after activating a flashing red light located atop the police car and the siren, Trooper Richey commenced pursuit. He observed Bunce cut in front of traffic, nearly causing an accident, and then leave Interstate 65 at the Crothersville southbound exit which lead to U.S. 31. As he drove down the ramp, Bunce forced another car off the road. Bunce then disregarded the stop sign at the end of the exit ramp, slid on to U.S. 31, and drove south toward Austin, Indiana.

7. Trooper Richey advised the Seymour State Police Post that he was still in pursuit. In addition to the siren and flashing red light, he turned on the four-way flashers and head lights. As the two vehicles proceeded south on U.S. 31, they were both traveling at speeds in excess of 100 miles per hour. The distance between the two cars remained about ¼ of a mile. Trooper Richey observed several vehicles proceeding southbound on U.S. 31 near the northern limits of Austin, and he saw at least two cars leave the road as Bunce passed them.

8. U.S. 31, as it approaches Austin, is upgrade for southbound traffic and then runs downgrade toward the junction of U.S. 31 and State Road 56. Trooper Richey felt it important that he reach the crest of the road before Bunce reached this intersection so that he could observe which road Bunce took. However, Trooper Richey was aware of the potential danger to traffic. He, therefore, reduced his speed to below 100 miles per hour as he approached the traffic ahead, believing that at the reduced speed he could still make the necessary observation.

9. There were, in fact, three vehicles proceeding south on U.S. 31 at the time Bunce approached Austin. First in line was a Mustang operated by Timothy Clyde O'Sullivan. Second in line was a vehicle operated by David Mains, and third in line was a vehicle operated by Larry Walker. David Mains observed the Nova pass the Walker vehicle. Realizing its excessive speed, he pulled his vehicle off to the right. After Bunce passed the Mains' vehicle, he moved the Nova farther to the left and passed the O'Sullivan vehicle which had not pulled off the road. As soon as the Nova passed him, Mr. Mains pulled his car back on to the road. Almost immediately he heard a siren and shortly thereafter observed a police car approaching him from the rear with a flashing red light operating. Both Mr. Mains and Mr. Walker yielded to the police car by pulling off the road. The O'Sullivan vehicle continued to proceed south in the driving lane. Trooper Richey moved into the northbound lane to pass the O'Sullivan car. However, shortly before reaching the intersection of U.S. 31 and Wilbur Avenue, Timothy O'Sullivan turned to the left in front of Trooper Richey and the collision occurred.

10. Subsequent to the collision, John Bunce was apprehended in Scottsburg. An examination of the Nova confirmed that the rear of the vehicle was riddled with bullet holes which appeared to be 38 caliber.

11. That on November 28, 1974, Section 3 of the Indiana Tort Claims Act, 34-4-16.5-3, provided in part as follows:

"Section 3. A governmental entity or an employee is not liable if a loss results from:

\* \* \* \* \* \*

(7) The enforcement of, or failure to enforce, a law."

12. That the loss for which claim is made herein resulted from the enforcement of a law by Sargent L. Richey, an Indiana State Trooper employed by the defendant, State of Indiana.

13. That the State of Indiana is immune from civil liability for the losses suffered by the plaintiffs herein.

14. That there is no genuine issue as to any material fact, and the defendant is entitled to a judgment as a matter of law.

IT IS, THEREFORE, CONSIDERED, ORDERED AND ADJUDGED by the Court that the defendant's motion for summary judgment be, and the same hereby is, granted, and,

It is further considered, ordered and adjudged by the Court that plaintiffs recover nothing by their complaint herein.

Because the foregoing discloses a myriad of fact questions, it is clear that the trial court's conclusion was rooted in the doctrine of sovereign immunity as it remains in *Ind. Code* 34–4–16.5–3.

█ We believe the proper resolution of this case requires a brief excursus into the common law of this state prior to the effective date of IC 34–4–16.5–3. As a predicate, it is important to keep in mind that governmental immunity and sovereign immunity are not interchangeable terms. Sovereign immunity is only applicable to the state, while governmental immunity applies to all units of government.

Our courts were generally more willing to erode the harshness of governmental immunity at the local level because it could be accomplished without diluting the scope of sovereign immunity. This task was achieved by characterizing municipal corporations as acting in a *dual* capacity. When it acted as an arm of the sovereign in performing functions on behalf of the state, it was protected in a derivative manner by the doctrine of sovereign immunity. Conversely, when it acted in its individual capacity, i. e., as a corporate entity, it could be held liable as any other private corporation:

> In order that the state may perform its functions it is necessary for it to be represented by agencies of government and, where these agencies merely perform such governmental functions, holding them responsible for negligence would be manifestly the same as holding the sovereign power answerable. On the other hand, a state agency, as a corporation, acquires an individuality distinct from the sovereign power, and the principle stated does not prevent the corporate body from being held liable for its own negligence; no more than it would exempt a public state officer from liability for his negligence in the management of his personal or private affairs.

*City of Kokomo v. Loy,* (1916) 185 Ind. 18, 21, 112 N.E. 994, 995. The touchstone of analysis in *Loy* focused upon the capacity in which the municipal corporation was acting. The individual capacity of a municipal corporation was most obvious when it engaged in functions akin to that of a business, and hence the distinction between proprietary and governmental acts was widely employed. *See, e. g., Flowers v. Board of Commissioners of the County of Vanderburgh, et al.,* (1960) 240 Ind. 668, 168 N.E.2d 224; *City of Logansport v. Public Service Commission of Indiana, et al.,* (1931) 202 Ind. 523, 177 N.E. 249.

The second area to attract the sympathies of the courts involved government officers clothed with governmental immunity. Again, it was possible to mitigate the harshness of immunity without affecting the liability of the state, as well as the derivative immunity of local governmental units. In this vein, our Supreme Court in *Wallace, et al. v. Feehan,* (1934) 206 Ind. 522, 190 N.E. 438, declared that an officer enjoys only a conditional privilege when performing a ministerial, as opposed to a discretionary, function. Thus, when vested with the authority to make a decision, the exercise of discretion incidental thereto was protected by governmental immunity. After the decision and manner of implementation had been made, however, the cloak of immunity was removed and he could be held *personally* liable for negligence in the performance of the act. *See also Adams v. Schneider, et al.,* (1919) 71 Ind.App. 249, 124 N.E. 718. At this juncture, therefore, sovereign immunity remained inviolate. Public officers, however, could be held personally liable in the negligent performance of ministerial

acts, and municipal corporations were unprotected when acting in a corporate or proprietary capacity.

As pertinent to the issues in the case at bar, *Stine v. Shuttle, et al.,* (1962) 134 Ind. App. 67, 186 N.E.2d 168, involved the sustaining of a demurrer to a complaint alleging negligence on the part of the City of Evansville, two Evansville policemen, and an Evansville city clerk. In that case, the clerk erroneously issued a warrant for the arrest of the plaintiff which was executed by the police officers. On appeal, this court reversed only as to the city clerk because the clerk was engaged in a ministerial act and, as such, could be held personally liable for negligence in the performance of that duty. This liability, however, would not attach to the city unless a proprietary function was being performed. In holding that the demurrer was properly sustained as to the city, the appellate court declared:

> [I]t is well settled that [a municipal corporation] is not liable for the acts of its officers in attempting to enforce police regulations, as such regulations are not made or enforced in the interest of the local corporation in its private capacity but in the interests of the public. *See Mayne v. Curtis, Rec.* (1920), (T.D.), 73 Ind.App. 640, 647, 126 N.E. 699.

134 Ind.App. at 76–77, 186 N.E.2d at 173. Therefore, since the function was governmental and not proprietary, the municipal corporation could not be held liable. As stated in *Loy,* the rationale for excusing liability was found in *Mayne v. Curtis, supra,* relied upon in *Stine:*

> A municipal corporation possesses two kinds of powers—one governmental and public, and to the extent they are held and exercised is clothed with *sovereignty;* the other private, and to the extent they are held and exercised is a legal individual. The former are given and used for public purposes; the latter for private purposes. While in the exercise of the former the corporation is a municipal government, and while in the exercise of the latter it is a corporate legal individu-

al. 6 McQuillin, Mun.Corp. § 2625. [Emphasis added].

73 Ind.App. at 646, 126 N.E. at 701.

Municipal corporation immunity based on the sovereign character of certain functions became a dead letter in the landmark decision of *Brinkman v. City of Indianapolis, et al.,* (1967) 141 Ind.App. 662, 231 N.E.2d 169. In *Brinkman,* a police officer responded to a call to transport Brinkman to the hospital. When he arrived, the officer was informed of Brinkman's severe illness. While in transit to the hospital, however, the officer arrested Brinkman for drunkenness and disorderly conduct. He was thereafter committed to jail without medical attention and subsequently died in his cell. An autopsy revealed a total absence of alcohol. A wrongful death action was instituted by the administratrix of Brinkman's estate. The complaint alleged, *inter alia,* that the police officer breached a duty to the decedent, and that the City was liable therefore. The trial court sustained the demurrer to the complaint.

On appeal, both parties relied on the governmental/proprietary distinction in support of their respective positions. In light of the "inherent inequities found in the governmental-proprietary distinction," however, the Appellate Court *en banc* laid to rest the "legalistic distinction," and opted to impose liability on the basis of *respondeat superior.* Furthermore, the *Brinkman* court declared that the relationship of *respondeat superior* was present as between the officer and the city. Therefore, the demurrer was erroneously sustained.

*Klepinger v. Board of Commissioners of the County of Miami, etc.,* (1968) 143 Ind. App. 178, 239 N.E.2d 160, *overruled on other grounds* 259 Ind. 55, 284 N.E.2d 733, illustrated the extension of *Brinkman* to civil cities and counties. In *Klepinger,* suit was brought against the county for negligence in the repair of a bridge. This court specifically held that the reparation of the bridge was a ministerial act and a proprietary function. Nevertheless, we proceeded to apply the reasoning and result of *Brinkman,* and declared that the doctrine of gov-

ernmental immunity was abrogated as to cities and counties, and that liability would lie where the relationship of *respondeat superior* was found to be present. We took occasion to quote at length and adopt the Kentucky Court of Appeals decision of *Haney v. City of Lexington, et al.,* 386 S.W.2d 738 (Ct.App.1964). The *Haney* court reviewed the pervasive critical attacks upon the doctrine of governmental immunity by legal scholars and courts of other jurisdictions. Relying thereon, the court recognized that the doctrine was "an anachronism" and existed "only by the force of inertia."[2] Further, that the doctrine was unfair in "denying a remedy for a wrong," which "results in the deprivation of life, liberty, and property without due process of law; and that [it] runs counter to a basic concept underlying the law of torts, that is, that liability follows negligence."[3]

The logical progression in the elimination of governmental immunity culminated in the abrogation of *sovereign* immunity in *Campbell, et al. v. State,* (1972) 259 Ind. 55, 284 N.E.2d 733. The *Campbell* court found persuasive the Appellate Court arguments in *Brinkman* and *Klepinger* and, therefore, applied the same rule to state liability in tort. Our Supreme Court recognized that the harshness of governmental immunity had no place in a modern system of equitable distribution of losses:

> We may also add that the elimination of sovereign immunity means a more equitable distribution of losses in society caused by the government unto members of society, rather than forcing individuals to face the total loss of the injury.

259 Ind. at 61, 284 N.E.2d at 736. In conclusion, the court held that the state may be held liable to the same extent as a municipal corporation or a county of the state. The court opined that the plaintiff must be able to establish a breach of a private duty owed to him. If such a showing is made, sovereign immunity will not shield the state from responsibility so long as the relationship of *respondeat superior* is present.

Nevertheless, the proper application of the "private duty" test proclaimed in *Campbell* was ambiguous. Clarification was squarely undertaken by Judge Lowdermilk in *Board of Commissioners of Delaware County v. Briggs,* (1975) Ind.App., 337 N.E.2d 852. The *Briggs* formulation noted that *Campbell* and subsequent decisions had established a two-pronged analysis. In the broad sense, since liability was predicated on the basis of *respondeat superior,* if the governmental officer was *personally* immune, then the state could likewise enjoy the sanction of immunity. As such, the earlier decisions holding an officer personally liable were revitalized and the discretionary/ministerial distinction was reborn. Thus, if the plaintiff could establish that the officer was engaged in a ministerial function, the plaintiff would be entitled to recover on the basis of *respondeat superior* since the officer was not protected by immunity.

The second prong of analysis, concerning the "private duty" test in *Campbell,* established that a discretionary act would generally confer immunity; however, if the plaintiff could show the existence of a private duty, the officer would not be immune from liability even if he was engaged in a discretionary act. Therefore, a cause of action would be stated if the plaintiff could show that:

(1) the officer was acting in a ministerial capacity; or

(2) the officer owed a private duty to the plaintiff to exercise due care.

Conversely, if the officer was engaged in a duty owed *only* to the public, then the exercise of *discretion* therein would support the defense of immunity.

A pertinent example of the vestigial remains of governmental immunity after *Campbell* is found in *Simpson's Food Fair, Inc. v. City of Evansville,* (1971) 149 Ind. App. 387, 272 N.E.2d 871. Suit was brought in negligence against the City on

---

**2.** *Quoting from Muskopf et al. v. Corning Hospital District,* 55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457, 460.

**3.** *Quoting from* 41 N.C.L.Rev. 290, 291 (1963).

the basis that the failure to halt a crime wave resulted in the insolvency of plaintiff's business. This court held that no private duty existed because municipalities do not owe an obligation to "guarantee" and "assure" the welfare of its citizens. In light of *Campbell*[4] and *Briggs,* we believe *Simpson* stands for the proposition that the *decision* to enforce or not to enforce a law is a discretionary act in the performance of a duty owed solely to the public, and therefore such decisions enjoy the cloak of immunity. This proposition is buttressed by the fact that *Simpson* did not rely on *Stine* or *Mayne.* Indeed, since the municipal corporation was held to be immune in *Stine* because the municipal corporation was not acting in its private or proprietary capacity, it was overruled by *Brinkman* and *Briggs.* Likewise, the precedential force of *Mayne* was eradicated by *Brinkman* since *Mayne* also was based on the governmental/proprietary distinction.

With this background in mind, we proceed to discern whether, under the common law of this state, the State Trooper owed O'Sullivan a private duty *or* whether he was engaged in a ministerial act.[5] With respect to the former, we have held that drivers of emergency vehicles owe a duty of care to the life and property of others when driving over the maximum speed limit. *Bailey, et al. v. L. W. Edison Charitable Foundation of Grand Rapids, Inc., et al.,* (1972) 152 Ind.App. 460, 284 N.E.2d 141.

The duty recognized in *Bailey* arose from IC 9–4–1–25, which in relevant part provides:

(d) The driver of an authorized emergency vehicle may:

\* \* \* \* \* \*

3. Exceed the maximum speed limits so long as he does not endanger life or property \* \* \*

(f) The foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others.

The *Bailey* court recognized that the statute was intended to extend a "tempered privilege" to drivers of emergency vehicles. Thus, we think a statutorily imposed duty towards private individuals exists by virtue of *Bailey* and IC 9–4–1–25.[6]

Moreover, we believe Trooper Richey, while in hot pursuit, was performing a ministerial act under the authority of *Briggs,* and the discretionary/ministerial test adopted therein from *Adams v. Schneider, et al., supra* :

'A duty is discretionary when it involves on the part of the officer to determine whether or not he should perform a certain act, and, if so, in what particular way, and in the absence of corrupt motives in the exercise of such discretion he

4. The *Campbell* court expressly approved the application of immunity in *Simpson.*

5. For illustrative cases relying on the discretionary/ministerial distinction, *see Mobile Enterprises, Inc. v. Conrad,* (1978) Ind.App., 380 N.E.2d 100; *Department of Commerce v. Glick,* (1978) Ind.App., 372 N.E.2d 479; *Salem Bank and Trust Co. v. Whitcomb,* (1977) Ind.App., 362 N.E.2d 1180; *Briggs, supra. See also Scott County School District 1 v. Asher,* (1974) 160 Ind.App. 299, 312 N.E.2d 131, *aff'd* 263 Ind. 47, 324 N.E.2d 496. For application of the private duty analysis, *see Roberts v. State, et al.,* (1974) 159 Ind.App. 456, 307 N.E.2d 501.

6. Under a similar statute, the Supreme Court of Arizona upheld the liability of a police officer in *Ruth et ux. v. Rhodes,* 66 Ariz. 129, 185 P.2d 304 (1947). In *Ruth,* there was testimony to the effect that the police officer was exceeding

the speed limit while responding to an emergency dispatch. When the officer attempted to pass the plaintiff's truck, the plaintiff turned left, thinking he could "make it" without being struck by the police car. A jury verdict in favor of the plaintiff was affirmed upon the basis that the jury could have found the officer negligent in light of a statute similar to our IC 9–4–1–25. *See also Eubanks v. Wood, et ux.,* 304 S.W.2d 567 (Tex.Civ.App.1957) (police officer held negligent under analogous statute for driving at an excessive rate of speed); *Goddard v. Williams,* 251 N.C. 128, 110 S.E.2d 820 (1959), (deputy sheriff held liable for driving at an excessive rate of speed in a residential district); 60A C.J.S. *Motor Vehicles* § 375 (1969). *See generally* Morrison, Negligent Operation of a Police Vehicle, 16 Clev.-Mar.L.R. (3), 442 (1967); 83 A.L.R.2d 383 (1962).

is not liable. His duties, however, in the performance of the act, after he has once determined that it shall be done, are ministerial, and for negligence in such performance, which results in injury, he may be liable in damages. [71 Ind.App.] at 255, 124 N.E. at 720.'

337 N.E.2d at 863. As a preliminary matter, therefore, we believe O'Sullivan would have been entitled to bring an action under the common law of this state. Hence, we must now decide if IC 34–4–16.5–3 grants immunity under the facts at bar in derogation of the common law.

■ The State contends the legislature resurrected immunity under the facts presented herein by the enactment of IC 34–4–16.5–3, which provides, in pertinent part:

IMMUNITY FROM LIABILITY.—A governmental entity or an employee is not liable if a loss results from:

\* \* \* \* \* \*

(6) the performance of a discretionary function;

(7) the enforcement of or failure to enforce a law \* \* \*[7]

With respect to sub-paragraph (6), we again agree with Judge Lowdermilk's observation in *Briggs* that the term "discretionary function" is identical to the remnants of immunity which attach when an officer exercises his discretion in the performance of a purely public duty. When the duty is not purely public but, rather, also involves a private duty, the fact that the officer was exercis-

ing discretion becomes irrelevant. Since we have concluded that a private duty was owed, sub-paragraph (6) is inapplicable.[8]

Moreover, the crux of this dispute concerns the application of IC 34–4–16.5–3(7). With respect to the *failure* to enforce a law, we think it clear that the legislature intended to codify our result in *Simpson,* i. e., the failure to enforce a law is a discretionary act done in furtherance of a duty which is owed solely to the public.[9] With respect to the immunity from losses resulting from the *enforcement* of the law, the legislative intent is not so easily discerned. Broadly speaking, "enforcement" might reasonably encompass: (1) the decision to enforce; (2) the decision to enforce in a particular manner; (3) the actual implementation of such a decision; and (4) the *result* of enforcement, i. e., the result of the exercise of restraint or compulsion upon those persons who are the object of the decision to enforce the law.[10]

■ The plain meaning of "enforcement," however, does not dictate the specific inclusion or exclusion of the above elements. Since the decision to enforce a law is parallel to the decision not to enforce a law, it is clear that in light of consistency and the holding in *Simpson,* the legislature intended immunity to attach. We also believe the legislature intended to shield an officer from civil liability based upon the result of enforcement as it affects the person or persons against whom the enforce-

---

7. The act now reads:
IMMUNITY FROM LIABILITY. A governmental entity or an employee within the scope of his employment is not liable if a loss results from:

\* \* \* \* \* \*

(7) the adoption and enforcement of or failure to adopt or enforce a law, including rules and regulations, unless the act of enforcement constitutes false arrest or false imprisonment

\* \* \* \* \* \*

8. Further, Dean Foust has suggested that IC 34–4–16.5–3, with a minor exception not applicable here, is merely a codification of the common law. *See* 8 Ind.L.Rev. 264, 274–276; *Briggs, supra.*

9. We are unable to say that there will *never* be a situation where such a decision would be so flagrant so as to remain protected.

10. The elasticity of the term permits it to be applicable, arguably, to every step in the law enforcement process. For example, brutality to incarcerated prisoners might be protected since the imprisonment is merely a stage in the process of enforcing the law. We narrow the number of possible meanings to those relevant to the facts at bar for the sake of clarity. We by no means intend to suggest "enforcement" has a finite number of meanings, or that those in the body of this opinion are the *only* meanings.

ment is directed.[11] Therefore, it is clear that the legislature intended enforcement to mean at least that the decision to enforce and the end result thereof upon the object of the enforcement (within the bounds of law) is protected activity and will not give rise to a civil action for damages.

We are uncertain, however, whether the legislature· intended the cloak of immunity to cover the activities in the second and third categories above. As such, we must resort to our interpretive powers to discern the intended operation of the statute. *See Indiana State Highway Commission, et al. v. White*, (1973) 259 Ind. 690, 291 N.E.2d 550.

 First, to say that the legislature intended the state and its employees to be immune in the actual implementation of the decision to enforce a law would be to sanction and permit negligent and even reckless implementation of such a decision. We are reminded .that it was instrumental in the erosion of governmental immunity that the doctrine necessarily resulted in hardship to the individual. *See Brinkman, supra; Campbell, supra.* It is axiomatic that we will not construe a statute in a manner which results in harsh or unjust consequences. *Reece v. Review Board of the Employment Security Division*, (1977) Ind. App., 360 N.E.2d 1262, and cases cited therein. Therefore, we do not believe the legislature intended "enforcement" to shield negligent and reckless conduct in the carrying out of a decision to enforce the law.

 Furthermore, it is also fundamental that statutes in derogation of the common law will be strictly construed; therefore, in case of doubt, we will favor a construction which is in harmony with the common law. *Helms, et al. v. The American Security Company ·of Indiana, Inc.*, (1939) 216 Ind. 1, 22 N.E.2d 822. Under our review of the common law of this state, it is clear that the decision to implement the enforcement of a law in a particular way is a discretionary act, while the performance thereof is ministerial. *Briggs, supra.* Thus, under the common law, an officer could be held liable for the ministerial act of carrying out a decision to enforce the law. Also, as just noted, the imposition of liability in such a case will avoid judicially recognized hardship to the individual. Hence, absent a clear showing of legislative intent to the contrary, "enforcement"[12] does not encompass the mechanical implementation of the decision to enforce a law.

 With respect to the decision to enforce the law in a particular way, it is a discretionary function and will be exempt from liability *so long as* the plaintiff is unable to establish a private duty.[13] *See Briggs, supra.* Therefore, we hold that IC 34–4–16.5–3(7) is in harmony with the common law, and hence the summary judgment in favor of the State was improvidently granted.

To facilitate the proceedings below on remand, we deem it advisable to discuss the appropriate standard of care owed by

---

11. Although not controlling, we may look to subsequent amendments to an act in discerning legislative intent. *Oster v. Department of Treasury, et al.*, (1941) 219 Ind. 313, 37 N.E.2d 528. The amendments, *supra* note 7, clearly disclose that the legislature was concerned with the end result of enforcement upon the object thereof.

12. *Compare* the explicit legislative intent seen in these Kansas and Arkansas cases:

[K.S.A.] 46—901—
 (a) It is hereby declared and provided that the following shall be immune from liability and suit on an implied contract, *or for negligence or any other tort*, except as otherwise specifically provided by statute:
 (1) The State of Kansas * * *

Quoted from *Brown, et al. v. Wichita State University, et al.*, 219 Kan. 2, 547 P.2d 1015, 1020 (1976). (Emphasis added).
 It is hereby declared to be the public policy of the State of Arkansas that all counties . . . and all other political subdivisions of the State shall be immune from liability for damages, *and no tort action shall lie against any such political subdivision, on account of the acts of their agents and employees.* [Emphasis added].
Quoted in *Sullivan v. Pulaski County*, 247 Ark. 259, 445 S.W.2d 94, 95 (1969).

13. *It seems obvious that, generally speaking, such a decision will be owed solely to the public.*

Trooper Richey to O'Sullivan. We do not believe that the mere fact that a defendant is a police officer requires a departure from traditional negligence principles. Thus, the standard to be employed is whether the defendant exercised his duty with the level of care that an ordinary prudent person would exercise under the same or similar circumstances. *Orth v. Smedley,* (1978) Ind. App., 378 N.E.2d 20; *DeMichaeli & Associates v. Sanders,* (1976) Ind.App., 340 N.E.2d 796; *Allied Fidelity Ins. Co. v. Lamb,* (1977) Ind.App., 361 N.E.2d 174. Of course, a layman is generally not exposed to the unique circumstances attendant to police work. It is important, therefore, that the trier of fact consider in its deliberation the particular circumstances involved in a case such as the one before us. By way of explanation, such circumstances might include among others, the probability of harm to third persons and the gravity of an injury that would result therefrom, the availability of assistance by other police units, and the severity of the criminal conduct of the suspected felon.

Reversed and remanded.

LYBROOK, P. J., and LOWDERMILK, J., concur.