Cheryl TOM, Individually and as Administratrix of the Estate of Wayne Lee Tom, deceased, Appellant–Plaintiff,

v.

Dawn VOIDA, Individually and in her Official Capacity as a Police Officer of the City of Indianapolis, Paul A. Annee, Individually and in his official Capacity as Chief of Police, Indianapolis Police Department, and The City of Indianapolis, Appellees–Defendants.

No. 49A05–9407–CV–293.

Court of Appeals of Indiana.

Aug. 7, 1995.

Richard Kammen, Indianapolis, for appellant.

Andrew P. Wirick, Indianapolis, for appellees.

## OPINION

SHARPNACK, Chief Judge.

Cheryl Tom ("Appellant") appeals the trial court's entry of summary judgment in favor of Dawn E. Voida, Paul A. Annee, and the City of Indianapolis (collectively, "the Appellees") on Appellant's complaint alleging the wrongful death and assault and battery of her son, Wayne Lee Tom. We affirm.

Appellant raises seven issues, of which only five require our resolution. Restated, those issues are:

1. whether the doctrine of res judicata or collateral estoppel is applicable in the present case;

2. whether there are genuine issues of material fact which preclude the entry of summary judgment in favor of the Appellees;

3. whether Voida was authorized to institute an investigatory stop of Tom or had probable cause to arrest Tom;

4. whether the Appellees are immune from suit under the Indiana Tort Claims Act; and,

5. whether the trial court's entry of summary judgment was erroneous because each of the elements of a wrongful death claim are present in this case.

The facts most favorable to the nonmovant, Appellant Cheryl Tom, are as follows. On December 10, 1988, at approximately 9:45 p.m., Indianapolis police officer Dawn Voida was on routine patrol when she received a radio run to an address on North Walcott for shots fired. When Voida was en route to the address, Voida observed a white male, Wayne Lee Tom, fall off of his bicycle and the bicycle fall on top of him. As Voida drove past Tom, she noticed that he was laying on his back with his arms and legs in the air "like a bug." Record, p. 549. Voida observed Tom through her rear view mirror and, upon observing that Tom was still on the ground, stopped and exited her vehicle. Voida was wearing full police uniform with her badge on the outside of her coat, and her vehicle was a marked police car. Voida did not suspect Tom of any crime at this point, and did not have reason to believe that he was connected with the situation on Walcott.

As Voida approached Tom, he began to stand and to pick up the bicycle. While still walking toward Tom, Voida asked "Hey, are you okay?" Record, p. 555. Tom did not respond and just looked at Voida. Voida then repeated her question, "Hey, are you okay?" Record, p. 555. Voida continued her inquiries as she approached Tom, who looked over his shoulder and continued looking at Voida as he started walking away, pushing the bicycle. Voida continued walking toward Tom and inquiring if Tom was hurt. Tom "picked up the pace" and began walking faster. Record, p. 557. Tom was now walking at a brisk pace, and Voida said " 'Hey. Wait a minute.' " Record, p. 558. At this point,

Tom looked sharply at Voida, threw down the bicycle, and began running.

Voida's deposition testimony reflects that when Voida first stopped her vehicle, she was concerned that Tom was hurt and she did not want to leave him out in the cold weather if he were not going to get up on his own. When Tom threw down the bike, however, her perception of the situation began to change, and her suspicions were aroused. Voida ordered Tom to stop. Tom did not comply, and Voida decided to pursue him. Voida then used her remote radio to inform headquarters that she was engaged in a foot pursuit.

Tom slipped and fell to the ground on his stomach, allowing Voida to catch up to him. Voida knelt on Tom in an attempt to handcuff him. Tom rolled over and knocked Voida over. Voida testified at her deposition that Tom then began attacking her. Tom took Voida by the hair and repeatedly hit her head against the concrete. Voida began yelling and screaming for help. Voida managed to push herself up somewhat at which point Tom got up and attempted to get away. Voida grabbed Tom's leg to prevent him from running, and Tom stepped on Voida's head. Voida screamed at Tom to stop standing on her head. Voida then lost her strength and let go of Tom's leg. Tom began to run.

Voida got up and continued the pursuit. Voida explained her decision to continue the pursuit as follows:

"A. Well, I, at that point I continued the chase because he had committed a felony, battery serious bodily injury [sic] on a police officer, and I'm going to catch him. I'm going to attempt to catch him and find out who this individual is the same as if he would have attacked a, quote unquote, normal citizen.

At this point I've asked him to stop, told him to stop, and, you know, originally then he flees from me, which is a misdemeanor and then at that point I go on to where I've initially apprehended him, if you will, although it's not really an apprehension when there is no control on my part.

The fight continues. I'm getting beat about the head, stepped on the head, and at that point it's battery on a police officer with serious injury and I continued to pursue him hopefully in order to make an apprehension."

Record, pp. 580–81.

As Voida chased Tom, she repeatedly yelled for him to stop and repeatedly radioed for assistance. Tom went over a fence and Voida followed. When Tom attempted to negotiate a second fence, he lost his balance and fell to the ground. Voida caught up to Tom and fell on top of him. The two again struggled, and Tom began hitting Voida in the face with his fist. Voida did not have her nightstick or flashlight, so she thought of using her chemical spray to subdue Tom. Voida's left arm was incapacitated, however, and she did not want to reach for her chemical spray with her right hand because Tom would have had free access to her gun. Voida then pulled her gun.

Voida pushed herself away from Tom, brought her gun out in front of her, and stated three times, " 'Please don't make me shoot you.' " Record, p. 593. Tom came at Voida again, with his hands raised, and Voida discharged her weapon. This first shot did not hit Tom. Tom moved back and then came at Voida again, this time with his arms more spread out. Voida fired a second shot which did hit Tom. The wound was fatal.[1]

---

1. The record reveals that Voida reenacted many stages of the struggle with Tom, including the position of Tom's arms during this final confrontation when moving toward Voida, in front of a video camera as a part of her deposition testimony. The videotape has not been included in the record on appeal. It is not clear that the videotape was presented to the trial court. Appellant describes this final sequence of events as follows:

"Voida told Tom, 'Please don't make me shoot you. I don't want to have to shoot you.' R.p. 593. Tom responds by taking a step towards Voida with his hands raised. R.p. 593–594. Voida fired one shot at Tom, missing him. R.p. 594. *Tom kept his hands raised in the universal sign of surrender even after Voida fired at him the first time.* R.p. 594."

Appellant's brief, p. 8 (emphasis added). Appellant's description of Tom being in "the universal sign of surrender" does not find support in the record. In pertinent part, Voida's deposition testimony to which Appellant cites was as follows:

On August 4, 1989, Appellant, the decedent's mother, filed her five count complaint for damages against the Appellees in the United States District Court, Southern District of Indiana, Indianapolis Division. Counts I and II of the complaint sought damages pursuant to 42 U.S.C. § 1983. In these federal claims, Appellant alleged that the Appellees had violated Tom's Fourth Amendment rights under the United States Constitution by seizing Tom without reasonable suspicion or probable cause and by using excessive force against him. *Tom v. Voida* (1992), 7th Cir., 963 F.2d 952, 955–56. Counts III and IV were state law wrongful death claims based on negligence. Count V was a state law tort claim based on assault and battery. The district court granted summary judgment in favor of the Appellees on the federal claims, and dismissed the pendent state claims without prejudice. *Id.* at 956. The United States Court of Appeals for the Seventh Circuit affirmed the judgment on May 8, 1992. *Id.* at 962.

In affirming the district court's judgment, the Seventh Circuit determined, in pertinent part, that: (1) Voida's initial questioning of Tom was noncoercive and required no suspicion of criminal activity; (2) Voida's initial attempt to cuff Tom was a justified incident to an investigatory stop; (3) the attempt to restrain Tom did not convert the *Terry* stop into an arrest; (4) even if Voida's attempt to cuff Tom constituted an arrest, Voida had probable cause at that point to justify an arrest;[2] (5) that Voida was clearly justified in pursuing Tom after the first physical altercation because at that point she had more than probable cause to effect an arrest—he had committed crimes of fleeing and battery against her; and (6) Voida was justified in using deadly force against Tom because he already had inflicted serious bodily injury on her and threatened to continue inflicting injury on her. *Tom,* 963 F.2d at 956–62. The Seventh Circuit concluded that the district court did not err in its determination that Voida had not used excessive force as a matter of law and that, because Voida had not violated Tom's constitutional rights, there was no basis on which to hold the other defendants liable. *Id.* at 961–62. Accordingly, the Seventh Circuit affirmed the district court's entry of summary judgment in favor of the Appellees on Appellant's claims under 42 U.S.C. § 1983.

On September 11, 1992, Appellant filed her complaint for damages in the Marion County Superior Court, asserting her state law claims for wrongful death and assault and battery. In Count I of the complaint, Appellant, as the natural mother of Tom, alleged that "Tom. was killed as a direct and proxi-

"A. I somehow—I don't know exactly how I did it but I pushed myself away some and put a little bit of distance between us. This is probably a fair approximation of the distance between us.

I'm starting to plead with him. Now I bring my gun out in front of me and he's starting to stand up and I said, 'Please don't make me shoot you. I don't want to have to shoot you.' I did this same sentence, same verbalization three times, 'Please. Don't make me shoot you.' I'm begging him.

He comes at me, you know, he just starts coming at me.

\* \* \* \* \* \*

A. I would be down here and he started at me like this again.
Q. Okay. He raised his hands?
A. Yes. And started stepping into me. And that's when I fired the first round.
Q. And to your knowledge did that round hit him?
A. To my knowledge, it did not.
Q. And what happened next?
A. And then he went back like this and came at me again, and I shot again, but more like this with his arms out like this.

Q. With his arms more spread?
A. More spread like this."
Record, pp. 593–94.

2. Specifically, the court found that once Tom threw the bike down and began to flee, Voida had a reasonable suspicion of criminal activity. 963 F.2d 952. The court further found that Tom's continued flight and defiance of Voida's orders to stop gave her probable cause to effect an arrest. *Id.* at 959–60.

"Tom's uncomfortable glances toward Officer Voida, his abandonment of a fairly new bicycle in a high-crime area, his defiance of her order to stop, and his obvious determination to flee from any contact with her gave Voida probable cause to arrest him for stealing the bicycle. And once Tom defied Voida's orders to stop, she may also have had probable cause to arrest him for 'resisting law enforcement,' in violation of I.C. § 35–44–3–3 (Burns 1991 Supp.) [footnote omitted] Voida acted permissibly." 963 F.2d at 960.

mate result of negligent and careless conduct on the part of Defendant Voida." Record, p. 15. This Count further alleged that Police Chief Annee "directly and proximately caused the above described injury" to Tom by failing to properly train and supervise Voida and to control her conduct, and by failing to discipline officers employing excessive force. Record, p. 15. Similarly, Appellant alleged that the City of Indianapolis caused Tom's injury by failing to properly train, supervise, and control Voida and Annee, and by failing to discipline officers using excessive force. Count II raised the same allegations as Count I, but was asserted by Appellant as the administratrix of the estate of Tom. The final count, Count III, incorporated the preceding paragraphs and alleged that the shooting constituted an assault and battery by Voida against Tom.

On November 29, 1993, the Appellees filed their motion for summary judgment and supporting memorandum. On January 21, 1994, Appellant filed her opposition to the Appellees' motion for summary judgment and supporting memorandum. On April 18, 1994, the trial court granted the Appellees' motion for summary judgment. Appellant then initiated this appeal.

When we review a trial court's entry of summary judgment, we are bound by the same standard as the trial court: We may only consider those portions of the pleadings, depositions, answers to interrogatories, admissions, matters of judicial notice, and any other matters designated to the trial court by the moving party for the purposes of the motion for summary judgment. *Rosi v. Business Furniture Corp.* (1993), Ind., 615 N.E.2d 431, 434; Ind.Trial Rule 56(C), (H). We may not reverse summary judgment orders on the ground that there is a genuine issue of material fact unless the material facts and the relevant evidence were specifically designated to the trial court. *Id.* The appellant bears the burden of proving that the trial court erred in determining that there are no genuine issues of material fact and that the moving party was entitled to judgment as a matter of law. *Id.* All properly asserted facts and reasonable inferences should be resolved against a moving party.

*Indiana Board of Public Welfare v. Tioga Pines* (1993), Ind., 622 N.E.2d 935, 940, *cert. denied,* —— U.S. ——, 114 S.Ct. 1302, 127 L.Ed.2d 654.

## I

The first issue raised for our review is whether the doctrine of res judicata or collateral estoppel is applicable. Appellant contends that the doctrines of res judicata and collateral estoppel are not applicable for three reasons. First, the federal standard for summary judgment differs from the Indiana standard for summary judgment. Second, she was not afforded a full and fair opportunity to litigate her claims in federal court. Third, the substantive law involved in the federal adjudication differs from that involved in the present action. The Appellees argue that they are entitled to the defensive use of collateral estoppel in the present case. We agree with the Appellees.

The doctrine of collateral estoppel "bars relitigation of a fact or issue where that fact or issue was necessarily adjudicated in an earlier suit and that fact or issue is presented in the subsequent lawsuit." *Indiana Department of Environ. Management v. Conard* (1993), Ind., 614 N.E.2d 916, 923. The doctrine of res judicata, on the other hand, "bars a later suit when an earlier suit resulted in a final judgment on the merits, was based on proper jurisdiction, and involved the same cause of action and the same parties or privies as the later suit." *Id.*

Because Appellant's claims under 42 U.S.C. § 1983 are not the same claims as underlying the present appeal, res judicata, also known as claim preclusion, does not apply here. *See Conard, supra; see also Sullivan v. American Cas. Co. of Reading, P.A.* (1992), Ind., 605 N.E.2d 134, 137 (discussing res judicata and collateral estoppel, and eliminating the elements of identity of parties and mutuality of estoppel for the defensive use of collateral estoppel).

We must determine next whether the doctrine of issue preclusion, or collateral estoppel, applies. If so, the doctrine of collateral estoppel will operate to bar Appellant's relitigation of the same facts or issues which

necessarily were adjudicated in the federal action. *Id.* at 137. In such a situation, the first adjudication is conclusive on those facts or issues even though the subsequent action is on a different claim. *Id.* Under modern rules governing the application of collateral estoppel, "the prime consideration is whether the party against whom the prior judgment is pled had a full and fair opportunity to litigate the issue and whether it would be otherwise unfair under the circumstances to permit the use of collateral estoppel." *Id.* at 138.

■ Appellant first argues that collateral estoppel should not be applied here because "the burden of proof in the two proceedings differs." Appellant's brief, p. 14. Appellant correctly observes that federal summary judgment procedure differs significantly from Indiana's summary judgment procedure. *See Jarboe v. Landmark Community Newspapers of Indiana, Inc.* (1994), Ind., 644 N.E.2d 118, *reh'g denied.*

> "Under the federal rule, the party seeking summary judgment is not required to negate an opponent's claim. The movant need only inform the court of the basis of the motion and identify relevant portions of the record, 'which it believes demonstrate the absence of a genuine issue of material fact.' [Citation omitted] The burden then rests upon the non-moving party to make a showing sufficient to establish the existence of each challenged element upon which the non-movant has the burden of proof."

*Id.* at 123. Under Indiana's summary judgment procedures, the proponent of the motion must demonstrate the absence of a genuine issue of material fact, negating an element of the nonmovant's claim. The burden then shifts to the nonmovant to demonstrate the existence of a genuine issue of material fact. *See Jarboe, supra; Rosi, supra;* T.R. 56(C). Appellant argues that because in Indiana the nonmovant need only show the existence of a genuine issue of material fact, without regard to the ability to sustain the burden of proof at trial, the differences between federal summary judgment practice and Indiana summary judgment practice pre-

clude the application of collateral estoppel in the present case. We disagree.

■ In support of her position, Appellant cites to dicta in *Turner v. Estate of Turner* (1983), Ind.App., 454 N.E.2d 1247, 1248 n. 2, wherein this court observed in a footnote that "Generally, the results reached in criminal proceedings are not considered res judicata in civil cases, in part, because of the difference in the burden of proof." *Id.* The present case does not involve a criminal case and a civil case, however, but differing summary judgment standards in separate civil proceedings. Additionally, the *Turner* court went on to write that Turner had the burden of proving his insanity by a preponderance of the evidence at his criminal trial, and therefore, "collateral estoppel may well have been applicable under the present circumstances inasmuch as the issue and burden of proof were identical in both the criminal and civil proceedings." *Id.* We decline Appellant's invitation to construe the *Turner* footnote as meaning that the application of collateral estoppel is precluded where two civil proceedings are at issue, but the burdens on a motion for summary judgment are not identical. *See Hockett v. Breunig* (1988), Ind.App., 526 N.E.2d 995, 1001–02 (Shields, J., concurring) (observing that the quoted language indicates the court's willingness to consider collateral estoppel in the absence of the elements of identity of parties and mutuality of estoppel).

Appellant also cites *Comfax v. North American Van Lines* (1992), Ind.App., 587 N.E.2d 118. In *Comfax,* we reversed the entry of summary judgment on the issue of punitive damages because the trial court had applied the wrong standard in ruling on the motion for summary judgment. *Id.* at 128. Appellant argues that the trial court in *Comfax* applied the equivalent of the federal court standard, and this court reversed the trial court's ruling, demonstrating that "a grant of summary judgment in the federal court does not mandate that summary judgment would be appropriate in state court." Appellant's brief, p. 15. Although we agree with this general proposition, the issue with which we are presented is not whether the entry of summary judgment in the federal

action mandated summary judgment in the present case. We find Appellant's reliance on *Comfax* to be unpersuasive.

Appellant has failed to convince us that the difference in summary judgment standards prevents the application of collateral estoppel in the present case. Similarly, we do not find that this difference constitutes a special circumstance which would make the application of collateral estoppel unfair. The record reveals that when the district court entered summary judgment in favor of the Appellees, it was ruling on cross-motions for summary judgment. Thus, not only did Appellant choose the federal forum in the prior action, she also availed herself of its summary judgment procedures.

We turn next to Appellant's contention that she did not have a full and fair opportunity to litigate her claims in the federal court because it was not until after she responded to the Appellees' motion for summary judgment that the United States Supreme Court issued its decision in *California v. Hodari D.* (1991), 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690.

One of the issues determined by the federal litigation was the moment at which Voida could be said to have "seized" Tom. *Tom,* 963 F.2d at 956–57. In analyzing the issue, the Seventh Circuit first observed that a seizure has occurred when a police officer has restrained an individual's liberty by means of force or through a show of authority. *Id.* at 956. The Seventh Circuit then wrote:

"This test is objective; 'a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' *United States v. Mendenhall,* 446 U.S. 544, [554] 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.) (footnote omitted); *see also Florida v. Royer,* 460 U.S. 491 [500–502], 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983). In *California v. Hodari D.,* 499 U.S. 621 [626–28], 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991), the Court held that the objective test of *Mendenhall* states a necessary, but not a sufficient, condition for seizure. A seizure requires not only that the reasonable person feel unfree to leave, but also that the subject actually yield to a show of authority from the police or be physically touched by the police. *Id.,* [499 U.S. at 624–26], 111 S.Ct. at 1550. Under this test, a police officer who chases a fleeing suspect unsuccessfully has not seized that person. Similarly, an officer who yells 'Stop, in the name of the law!' at a fleeing person who continues to flee has not effected a seizure. *Id.*

*Hodari D.* governs this case. Although Voida followed Tom slowly, ordered him to stop, and then followed him more quickly, she did not seize Tom until she overtook him on the ice and physically touched him. As a result, even though Voida was *attempting* to execute an investigatory stop, her acts do not need to be justified by reasonable suspicion, let alone probable cause."

*Tom,* 963 F.2d at 956–57. Thus, the effect of *Hodari D.* was to further refine the rule laid out in *Mendenhall.*

Appellant notes that in opposing the Appellees' motion for summary judgment in the district court, she argued that an illegal seizure had occurred prior to the first time Voida touched Tom. Thus, she contends, the fact that *Hodari D.* was decided after she had submitted her response to the motion for summary judgment in the district court deprived her of the "opportunity to brief the application of *Hodari D.,* or submit additional evidence in support of her position in light of *Hodari D.*" Appellant's brief, p. 18. Appellant does not specify, however, how the outcome of this issue would have been any different if *Hodari D.,* an opinion adverse to Appellant's position, had been decided prior to the submission of her response to the motion for summary judgment. Similarly, Appellant does not inform us of the nature of the additional arguments or evidence she would have submitted in responding to the motion.

■ In any event, the Seventh Circuit's decision affirming the district court was not issued until May 8, 1992, well after the Supreme Court's decision in *Hodari D..* *Tom,*

*supra,* 963 F.2d at 952. Appellant did have the opportunity to brief and argue her case in light of the *Hodari D.* decision as a part of her federal appeal. Accordingly, we conclude that Appellant was not denied a full and fair opportunity to litigate her claims in the federal court due to the timing of the *Hodari D.* decision.

■ Finally, Appellant contends that collateral estoppel should not be applied because the substantive law underlying her federal claims differs from that involved in the present case. As noted above, issue preclusion applies when an issue which was necessarily adjudicated in the prior action is raised in a subsequent suit based on a *different* cause of action. *See Conard, supra,* at 923. Thus, the fact that the substantive law involved in Appellant's litigation of her § 1983 claims is different from the substantive law underlying her state claims does not preclude the application of collateral estoppel in the present case.

Having concluded that collateral estoppel may be applied in the present case, we must (1) determine what the federal judgment decided, and (2) examine how that determination bears on the present case. *Hockett, supra,* 526 N.E.2d at 1000 (Shields, J., concurring). We undertake this two-step process as a part of our discussion of the remaining issues.

## II

Appellant argues that the trial court erred in entering summary judgment because there are genuine issues of material fact regarding whether Tom beat Voida or the reverse, whether Voida was injured, whether the force used by Voida was reasonable under the circumstances, and whether Tom was reacting to Voida in self-defense. Appellant also argues that there are genuine issues of material fact on whether Voida had probable cause to arrest Tom and whether Voida used excessive force in effecting the arrest. We

hold that these matters were necessarily decided in the federal action and that Appellant is collaterally estopped from relitigating these matters.[3]

■ The Seventh Circuit wrote that in suggesting that Tom never beat Voida, Appellant had distorted the record and ignored considerable evidence corroborating Voida's story. *Tom,* 963 F.2d at 961. The court determined that Voida had a number of injuries consistent with her version of events, and that witnesses observed Tom kicking and striking Voida. *Id.* The court held that Voida's attempt to cuff Tom was a reasonable means of executing the investigatory stop, and that even if the attempted cuffing converted the *Terry* stop into an arrest, Voida had probable cause to effect an arrest at that point. *Id.* at 957–60. The court held that Voida had acted permissibly. *Id.* at 960. Finally, the court found that there was no evidence showing that Tom was attempting to surrender during the second confrontation, and held that the district court did not err in concluding that Tom posed a threat to Voida. *Id.* at 961.

The Seventh Circuit also held that once Tom threw down the bicycle and ran, Voida had a reasonable suspicion of criminal activity. 963 F.2d at 959. The court found that once Tom continued to flee, disobeying Voida's orders to stop, her reasonable suspicion ripened into probable cause to effect an arrest for stealing the bicycle and possibly resisting law enforcement. *Id.* at 959–60 (citing I.C. § 35–44–3–3 (Burns 1991 Supp.)). The Seventh Circuit determined that Voida was "clearly justified in continuing to pursue Tom" after the first physical confrontation. *Id.* at 961. "By this time, she had more than probable cause to arrest Tom. He had actually committed crimes against her by fleeing from her, I.C. § 35–44–3–3, and by committing battery against her. I.C. § 35–42–2–1 (Burns 1991 Supp.)."[4] *Id.* Finally, the court held that Voida "was justified in con-

3.  Appellant has not argued that Indiana law differs from federal law in matters of determining reasonable suspicion, reasonableness of an officer's actions, the presence of probable cause, or with respect to whether a particular use of force was excessive.

4.  We note that pursuant to I.C. § 35–42–2–1, the offense of battery is elevated to a class D felony if it results in bodily injury to a law enforcement officer. *See, e.g., Carty v. State* (1981), Ind.App., 421 N.E.2d 1151, 1152.

cluding that Tom could not be subdued except through gunfire," and that the district court did not err in concluding that Voida had not used excessive force as a matter of law. *Id.* at 961–62.

Appellant is collaterally estopped from relitigating the issues described above. *See White v. Allstate Insurance Co.* (1992), Ind., 605 N.E.2d 141. Because she is collaterally estopped from relitigating these issues, she has failed to convince us that there are genuine issues of material fact which render the trial court's entry of summary judgment inappropriate.

### III

The next issue we are asked to address is whether Voida was authorized to institute an investigatory stop of Tom or had probable cause to arrest Tom. Appellant contends that the trial court erred in ordering summary judgment in favor of the Appellees because these issues were addressed in the prior litigation only under federal constitutional standards and not under Indiana's constitutional standards.

In support of her position, Appellant cites authority for the proposition that certain provisions of the Indiana Constitution provide more protections than provided by analogous provisions in the United States Constitution. Appellant completely fails, however, to present any argument on Indiana law pertaining to investigatory stops, when a seizure occurs, or the determination of probable cause. We decline Appellant's invitation to reverse the trial court absent some articulation of why Voida's actions were justified under the federal Constitution, but were not (or might not be) justified under the Indiana Constitution.

Appellant also refers us to Article I, § 12 of the Indiana Constitution which provides in pertinent part that "[a]ll courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law...." Ind. Const. art. I, § 12. She then cites *Board of Public Works, City of Hammond v. L. Cosby Bernard & Co.* (1991), Ind.App., 565 N.E.2d 769, *trans. denied,* for the proposition that "[i]t would be ludicrous to hold that a party can be provided a remedy through the judi-

cial system but then not be able to enforce it." *Id.* at 771. We agree with the Appellees that Appellant's reliance on *Bernard & Co.* is misplaced.

In that case, the appellee-architect had obtained a judgment, based on a theory of quantum meruit, for services it had provided to the City. *Id.* at 769. The City subsequently refused to pay the judgment, arguing that a judgment based on quantum meruit could not be enforced against a city under Indiana statutory law. *Id.* at 770 (discussing I.C. § 34–4–16.4–2 (1988)). In granting summary judgment in favor of the architect, the trial court looked to Article I, § 12 of the Indiana Constitution. *Id.* This court affirmed the trial court's grant of summary judgment, holding that the architect was entitled to collect its judgment. *Id.* at 770–71. *Bernard & Co.* simply has no application to the present case.

Appellant's cursory references to the Indiana Constitution do not provide a basis for reversing the trial court.

### IV

The next issue we are asked to address is whether the Appellees are immune from suit under the Indiana Tort Claims Act. Indiana Code § 34–4–16.5–3 provides, in pertinent part:

> **"Actions or conditions resulting in nonliability.**—A governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from:

> \*     \*     \*     \*     \*     \*

> (7) The adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations), unless the act of enforcement constitutes false arrest or false imprisonment; ..."

I.C. § 34–4–16.5–3(7). In 1981, our supreme court held that "an officer engaged in effecting an arrest is ... enforcing a law," and that I.C. § 34–4–16.5–3(7) provides law enforcement immunity with regard to injuries resulting from the enforcement of a law, unless such enforcement constitutes false arrest or false imprisonment. *Seymour Na-*

*tional Bank v. State* (1981), Ind., 422 N.E.2d 1223, 1226, *modified on reh'g*, 428 N.E.2d 203, 204. In 1991, in *Tittle v. Mahan* (1991), Ind., 582 N.E.2d 796, 798, the supreme court reconsidered some of the language it used in its *Seymour* decision and clarified that the phrase "enforcement of a law" is "limited to those activities attendant to effecting the arrest of those who may have broken the law." *Tittle*, 582 N.E.2d at 801.

In 1993, the supreme court issued its decision in *Quakenbush v. Lackey* (1993), Ind., 622 N.E.2d 1284, *reh'g denied*, overruling *Seymour* and abandoning dicta in *Tittle*. On the same day it issued its *Quakenbush* decision, the court also issued its decisions in *Belding v. Town of New Whiteland* (1993), Ind., 622 N.E.2d 1291, *reh'g denied*, *Fries v. Fincher* (1993), Ind., 622 N.E.2d 1294, and *Kemezy v. Peters* (1993), Ind., 622 N.E.2d 1296, all of which were decided in light of the court's opinion in *Quakenbush*.

In *Quakenbush*, the court drew on this court's decision in *Seymour National Bank v. State* (1979), 179 Ind.App. 295, 384 N.E.2d 1177, authored by Judge Robertson, writing that,

> "In writing the *Seymour* opinion for the Court of Appeals, Judge Robertson described the 'public-private' duty test of *Campbell* [*et al. v. State*, (1972) 259 Ind. 55, 284 N.E.2d 733], and concluded that the obligation of a police officer to use reasonable care in the operation of a squad car was a private duty. 384 N.E.2d at 1187. Pursuant to that conclusion, at common law, a officer would not be immune for the breach of that duty. Judge Robertson also addressed whether Section 3(7) changed the common law. In doing so, he concluded that the term 'enforcement of the law' rendered Section 3(7) ambiguous and ultimately concluded 'that the legislature intended enforcement to mean at least that the decision to enforce and the end result thereof upon the object of the enforcement (within the bounds of law) is protected activity and will not give rise to a civil action for damages.' *Id.* at 1186. In other words, he reasoned that the decision of whether or not to investigate a crime, whether to arrest a particular indi-

vidual for committing a crime, and the arrest itself were protected activities so long as the acts are otherwise conducted legally. He concluded that these activities were in the nature of the public duty owed by law enforcement officials to the community as a whole. *Id.*

We believe this analysis comports with the legislature's intent when it drafted Section 3(7). This analysis also gives meaning to the exception in Section 3(7) that immunity does not apply if an officer's conduct results in false arrest or false imprisonment.

\* \* \* \* \* \*

Accordingly, we hold that Section 3(7) was intended to codify the common law as it existed at the time the Act was passed. The state of the common law was such that governments and their employees were subject to liability for the breach of private duties owed to individuals, but were immune from liability for the breach of public duties owed to the public at large."

622 N.E.2d at 1289–91.

Based on its revised interpretation of I.C. § 34–4–16.5–3(7), the court determined that law enforcement immunity would not attach in suits based on the negligent driving of a squad car on the way to the scene of a crime, *Quakenbush* and *Fries, supra,* for the negligent parking of a police vehicle, *Belding, supra,* or the use of excessive force in effecting an arrest, *Kemezy, supra.*

Appellant contends that under *Quakenbush* and its progeny, specifically *Kemezy*, the Appellees are not immune for Voida's alleged use of excessive force against Tom. We agree. The Appellees essentially concede that law enforcement immunity does not apply in the present case, but present some argument to the contrary in order to prevent waiver of this issue.

■ Accordingly, independent of the other issues presented on appeal and without commenting on the merits of Appellant's case, we hold that the Appellees are not immune from suit based on Appellant's allegations that Voida used excessive force against Tom.

## V

The next issue raised for our review is whether the trial court's entry of summary judgment was erroneous because each of the elements of a wrongful death claim are present in this case.

 Appellant correctly observes that the elements of her claims for wrongful death are a duty owed by the defendant to the decedent, breach of that duty, and an injury proximately caused by the breach. *Greathouse v. Armstrong* (1993), Ind., 616 N.E.2d 364, 368. Appellant is also correct that Voida owed Tom a private duty to refrain from using excessive force in effecting his arrest. *Kemezy, supra.* We find, however, no evidence of a breach of Voida's duty to Tom.

As noted above, Appellant is collaterally estopped from relitigating the issue of whether Voida used excessive force in arresting Tom. The district court determined as a matter of law that Voida had not used excessive force and the Seventh Circuit affirmed this determination. *Tom,* 963 F.2d at 961–62.

Even if Appellant were not collaterally estopped from relitigating this issue, we would reach the same conclusion as the federal courts.

Indiana Code § 35–41–3–3 provides in pertinent part that:

(b) A law enforcement officer is justified in using reasonable force if the officer reasonably believes that the force is necessary to effect a lawful arrest. However, an officer is justified in using deadly force only if the officer:

(1) Has probable cause to believe that that deadly force is necessary:

(A) To prevent the commission of a forcible felony; or

(B) To effect an arrest of a person who the officer has probable cause to believe poses a threat of serious bodily injury to the officer or a third person; and

(2) Has given a warning, if feasible, to the person against whom the deadly force is to be used.

I.C. § 35–41–3–3(b).

The facts most favorable to Appellant show that Tom was shot as he was "coming at" Voida a second time with his arms spread out. Contrary to Appellant's contentions, this is not evidence of an attempt to surrender, nor is it sufficient to create a genuine issue of material fact regarding whether Tom was attempting to surrender. This evidence shows instead that Tom was continuing his attack on Voida. Under the circumstances of the present case, Voida was justified in using deadly force. I.C. § 35–41–3–3(b); *see Ellis v. State* (1990), Ind., 553 N.E.2d 829, 830–31 (officer was justified in using deadly force to prevent the escape of an arrested person who had committed a felony and battered a police officer), *reh'g denied.*

We conclude that the trial court did not err in entering summary judgment in favor of the Appellees because Appellant has failed to present any evidence to show that Voida breached her duty to Tom.

Having determined that Voida's actions were justified and that she did not use excessive force against Tom, there is no basis on which to hold former police chief Paul Annee or the City of Indianapolis liable for Voida's actions under trial court properly entered summary judgment in favor of the Appellees, we need not address Appellant's final issue of whether she was entitled to bring this action both individually and as the administratrix of Tom's estate under Ind.Code § 34–1–1–8(b)(1).

For all the foregoing reasons, the trial court's entry of summary judgment in favor of the Appellees is affirmed.

AFFIRMED.

GARRARD, J., concurs

RUCKER, J., concurs on issues I, II, III, IV and concurs in result on issue V.